**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO: 6:25-CR-350-PGB-RMN |
| | ) | |
| MARK LOFTIS | ) | |

**RESPONSE TO GOVERNMENT'S MOTION RE PRIVILEGE AND HEARSAY**

The government's motion regarding privilege and hearsay (Docket #33) is an improper attempt to preclude defendant Mark Loftis from presenting evidence that would undercut the government's proof of state of mind elements in this case – willfulness, knowledge, intent to defraud, and agreement to commit a crime.  In particular, the government must prove Mr. Loftis acted with an intent to violate a known legal duty, and Mr. Loftis has a constitutional right to present evidence that shows, to the contrary, he was acting in good faith, even if that faith turned out to be mistaken.  The government appears to incorrectly believe that a defendant's contacts with a lawyer can be relevant only to what has sometimes been called an affirmative advice-of-counsel defense, and the government's position relies heavily on a civil case that addressed a specific concern not present here, that did not go as far as the government requests here, and that did not implicate a criminal defendant's constitutional right to present a defense.

Moreover, the government's claim of potential undue prejudice is without merit.  This is not a case where a defendant is considering waiving privilege during trial and is withholding voluminous documents until that moment.  Mr. Loftis waived attorney-client privilege more than **four years ago** and has already produced voluminous emails. Furthermore, he subjected himself to examination by the government when he voluntarily testified before a grand jury in November 2025, and the government interviewed one of Mr. Loftis's prior attorneys about a year ago.

1

The government's motion also confuses a defendant's attempt to avoid testifying by introducing exculpatory post-arrest statements ("self-serving hearsay") with contemporaneous emails that will be admissible at trial for multiple purposes: (1) to prove what Mr. Loftis believed and knew at specific points in the relevant time period, regardless of the truth of the matters asserted, (2) under Federal Rule of Evidence 106 to provide context necessary to prevent emails the government introduces from misleading or confusing the jury, (3) as prior inconsistent statements if government cooperators testify contrary to the contemporaneous emails, and (4) as prior consistent statements supporting Mr. Loftis's testimony.

In terms of discovery, the motion is moot for the reasons discussed below.

## I.    **Legal Background**

This case involves charges of conspiracies to commit health care fraud and to violate the Anti-Kickback Statute. In order to prove such charges, the government has the burden to prove beyond a reasonable doubt that Mark Loftis acted "willfully," which is defined in the 11th Circuit Pattern Jury Instructions as follows:

> The word "willfully" means that the act was done voluntarily and purposely with the specific intent to violate a known legal duty. Disagreement with the law or a belief that the law is wrong does not excuse willful conduct.

Pattern Jury Instruction B9.1A.

When a person consults with an expert such as a lawyer, that consultation is relevant to whether or not the government has proven beyond a reasonable doubt the required state of mind. In this regard, *United States v. Scully*, 877 F.3d 464 (2d Cir. 2017), is instructive. There, the district court prevented the defendant from testifying about the legal advice that he received. The district court initially said that the evidence was not permitted because it was hearsay, though defense counsel "demonstrated that the testimony was not hearsay because it went to [the defendant's] state

2

of mind and was not offered for the truth of the matter asserted." *Id*. at 474.  The district court then excluded the evidence out of concerns of the prejudice to the government, hearsay concerns, and cumulativeness.  *Id*.

The Second Circuit found that the district court "erred in its balancing of the probative value and prejudicial effect of the proposed evidence under Rule 403." *Id*.  The Second Circuit noted that "it is difficult to identify what unfair prejudice that testimony would have imposed on the government," found that the proffered testimony was "by definition, not hearsay at all," and found the cumulativeness argument "unavailing." *Id*. at 474-75.

Finally, the Second Circuit found that the exclusion was not harmless because it went to the heart of the defense that the defendant did not have the requisite intent to defraud. The Second Circuit ordered a new trial, holding:

> Scully's defense was that he relied on the advice of counsel in operating his business and therefore lacked the requisite fraudulent intent that the government had to prove at trial. Evidence of [the lawyer's] advice was necessary to rebut the government's claim. Of course, the most persuasive evidence of that advice would have been testimony from [the lawyer] himself. But Scully was not legally required to call [the lawyer]. He was fully competent to testify about his own state of mind, and about how [the lawyer's] advice affected his state of mind. It was for the jury to determine whether that testimony was credible and raised a reasonable doubt about Scully's guilt.

*Id*. at 475-76.

Following the Second Circuit's reasoning in *Scully*, a district court's handling of the recent case involving Sam Bankman-Fried is instructive. *See United States v. Bankman-Fried*, 2023 WL 5392718 (S.D.N.Y. October 1, 2023) and 2024 WL 477043 (S.D.N.Y. February 7, 2024).

In the Bankman-Fried case, the government moved in limine to preclude the defendant from suggesting at trial that the mere presence or involvement of attorneys demonstrates that he lacked criminal intent.  Notably, the government's motion in the Bankman-Fried case relied on

3

*S.E.C. v. Tourre*, 950 F.Supp.2d 666 (S.D.N.Y. 2013), a case cited in the government's motion here. The district court granted the government's motion only in part. The district court precluded Bankman-Fried from referring in opening statement to the involvement of lawyers and required Bankman-Fried to provide notice before offering any evidence, argument or testimony on the involvement of attorneys.

Bankman-Fried then provided notice during trial of four general topics but did not specify the substance of his proposed testimony. The district court ordered the defense to provide an offer of proof outside the presence of the jury. The district court ruled that Bankman-Fried could testify about some areas but not others. Ultimately, the district court wrote in terms of admissibility: "the issue before this Court was not whether the defendant adduced evidence satisfying the elements of a formal advice-of-counsel defense, but rather whether the testimony he sought to give would have satisfied Rules 401 and 403." 2024 WL 477403 at *2. At the close of the trial, the district court instructed the jury about how to consider the role of lawyers in the context of the government's burden to prove Bankman-Fried's state of mind.

## II.    Factual Background

As the evidence at trial will show, Mr. Loftis believed that he was running his DME business legally and compliantly. Overall, his company Back Pain Home Supplies used marketers whom Mr. Loftis believed were acting compliantly. His company also got orders from doctors via two models: (1) a telemedicine model, which Mr. Loftis believed involved doctors who authorized braces after conducting appropriate evaluations and (2) a "doctor chase" model, which Mr. Loftis believed involved contacting patients' primary care physicians.

From 2017 through the spring of 2019, Mr. Loftis believed that his business was legal and compliant in part because he relied on Individual 2, the biller who taught him the DME business and who said that he would handle the "legal compliance and consulting needs" of Mr. Loftis's

company, as per an October 31, 2017 email.  For example, in March 2019, Individual 2 sent an email to Mr. Loftis in which he referred to himself as "one of the leading experts in the country regarding Legal Compliance for a DME Revenue Program."  Individual 2 said that he paid $50,000 to "a top Healthcare Law Firm" to ensure that his program was "legally compliant."[1]  Individual 2 discussed the Stark Law and the Anti-Kickback Statute and wrote, "I can fully assure the legal compliance program from the 30 supplier standard given throughout the entire legal compliance program I use meets every facet of these two laws."

Similarly, Mr. Loftis was told by marketing companies that his company did business with that they were acting compliantly.  For example, in April 2018, a representative of Prizm Media sent Individual 2 and Mr. Loftis an overview of Prizm's program, a 2015 opinion letter by an outside lawyer for Prizm regarding compliance with the Anti-Kickback Statute, and a presentation done by Prizm's CEO (Zeeshan Hayat), its president (Karina Hayat), and the outside lawyer who had written the opinion letter.

In early 2019, Mr. Loftis did become aware of concerns about the telemedicine companies and whether payments to such companies were compliant with the Anti-Kickback Statute.  In March and April 2019, a lawyer whom Mr. Loftis had retained to help with expansion plans for Mr. Loftis's company, Attorney 1, raised such concerns and recommended that Mr. Loftis end the agreements with some companies, including a telemedicine company.  Mr. Loftis did not agree with all of Attorney 1's advice and consulted with other people, including a representative of one of the telemedicine companies that Mr. Loftis worked with (Individual 3).  Individual 3 disagreed

---

[1]  At this time, Mr. Loftis does not know whether Individual 2's representation about hiring a law firm is correct.  But this is relevant to his state of mind, even if it turns out that Individual 2 was lying or wrong about this fact.

with Attorney 1's advice and referred to having advice from lawyers for the telemedicine company. "[Y]ou could put [15 healthcare attorneys in a] room and get 15 different examples," Individual 3 wrote (cleaned up). Mr. Loftis also talked with others, including a businessperson who talked with a law firm about developing a compliant method of conducting business with a telemedicine company (Individual 4).

Mr. Loftis continued to talk with Attorney 1, Individual 3, and others regarding telemedicine over the following months. At one point in September 2019, Mr. Loftis wrote to Attorney 1 that "you've answered pretty much everything in previous emails like we've talked about [and I] don't think there's really any way to marry Medicare and telemedicine in the same sentence no matter how hard we try to dissect the language." But Mr. Loftis continued to think about the issue, and he went to another lawyer in October 2019 to evaluate the issue. He then worked with Attorney 2, who reviewed the arrangements and spoke with Individual 3 regarding Individual 3's telemedicine company. Attorney 2 ultimately advised Mr. Loftis that Attorney 2 did not believe Individual 3's telemedicine company was actually operating as Individual 3 had represented. Mr. Loftis then terminated his arrangement with Individual 3's telemedicine company.

Mr. Loftis also had conversations with Attorney 1 about whether payments made in connection with the "doctor chase" model complied with the Anti-Kickback Statute. In or around August 2019, Mr. Loftis was looking to move away from the "telemedicine" model, and Attorney 1 recommended contacting Prizm to work on the "doctor chase" model. In September 2019, Mr. Loftis's company made an advance payment to Prizm. In November 2019, Mr. Loftis was frustrated with Prizm's work and talked with Attorney 1, who raised concerns about whether the

6

payment terms with Prizm violated the Anti-Kickback Statute.[2]  Mr. Loftis then wrote an email to Prizm as follows:

> My Attorney [Attorney 1] is familiar with your model.  We have bigger issues as of this morning.  He stated that because in reality you are charging per HCPCS code the Agreement is invalid and would be considered a 'sham' Agreement by prosecutors and therefore is not enforceable or legal.  He states it is a direct violation of AKS.  For my compliance I demand a full refund.  I expect confirmation of this refund today.  I am beginning to get very concerned over this model this is new information to me.

Karina Hayat of Prizm responded that they "stand on our contacts" and said that they were "welcome to have your attorney reach out."  Ultimately, Mr. Loftis agreed to finish the work with Prizm that had already been paid for.  He did not make any further payments to Prizm and ended the relationship soon afterwards.

Overall, there was a lot of confusion in 2019 about what was prohibited by the Anti-Kickback Statute in terms of marketers and telemedicine companies.  The government pushed an aggressive theory that subsequently was rejected by courts, and lawyers and others were not clear about what was prohibited and what was not.  All this is relevant to whether Mr. Loftis acted willfully and/or with intent to defraud and to whether he agreed with anyone to commit a crime.  Mr. Loftis does not intend to introduce the lawyers' statements for the truth of the matters asserted but to elucidate his state of mind through the conversations he had during the time the government alleges he was knowingly violating the law.

---

[2]  Subsequent decisions by the Fifth, Seventh Circuit, and Eleventh Circuits indicate that Attorney 1's opinion was incorrect, and that the conduct did not violate the AKS because Prizm was not a "relevant decisionmaker."  How those opinions affect the correctness of the government's legal theory in this case is, of course, a question for the Court, not the jury.  Mr. Loftis does not intend to introduce the lawyers' statements for their truth but solely for the fact that they were said to Mr. Loftis and formed part of his state of mind.

In addition, Mr. Loftis consulted Attorney 1 in connection with the CARES Act funds that his company received in 2020 and the attestation that is referenced in paragraph 45 of Counts Three and Four of the indictment.  In April 2020, Attorney 1 sent Mr. Loftis an email with information about who was eligible for funds under the CARES Act, including the statement "HHS broadly views every patient as a possible case of COVID-19."  Mr. Loftis responded by email, "Based on this I believe I will go ahead and submit this Attestation.  We are currently servicing diabetes patients for CGM [continuous glucose monitoring].  I do not see why I would not qualify if every patient is a possible case of COVID-19."

III.    **Procedural Background**

In or around January 2020, Mark Loftis became aware of the government's investigation into Back Pain Home Supplies.  He then retained an attorney to represent him in terms of the government's investigation.

In or around August 2021, Mr. Loftis signed a waiver of "any and all attorney-client privileges or work privileges relating to communications with and materials prepared by or on behalf of any attorneys or law firms that work for or with myself, Back Pain Home Supplies, LLC, LJM Health Group, LLC, Chirositez, LLC, and Drumright Chiropractic, LLC" with the exception of privileges relating to communications with attorneys whom he had retained in connection with government investigations and privileges relating to a joint defense privilege with PS.[3]  Counsel then produced thousands of emails to the government, including emails with Attorney 1.

In February 2025, law-enforcement agents interviewed Attorney 1.

---

[3]  Given that the indictment alleges that Mark Loftis committed crimes in 2020, when he was aware of the government's investigation of him and when he was represented in connection with that investigation, he is considering waiving privilege over those attorneys.  If he does so, he will notify the government sufficiently in advance of his introduction of such evidence.

In July 2025, the government made a presentation to Mr. Loftis and his counsel about the offenses that it believed Loftis had committed.  Mr. Loftis then sent an email to the government indicating that he was considering representing himself.  His counsel at the time then withdrew, and Mr. Loftis retained the undersigned counsel.

Mr. Loftis requested to testify before the grand jury that was investigating him, and he testified on November 19, 2025.

According to the indictment filed in this matter, an indictment was presented to the grand jury on December 17, 2025, and the grand jury approved the indictment.

Following the arraignment, the government has had discussions with undersigned counsel about the production of attorney-client materials.  On March 4, the government asked specifically about an attorney, Attorney 3, who worked at a large law firm with Attorney 2.  Undersigned counsel was not provided by prior counsel with a copy of the prior productions to the government, but checked the government's discovery, which included a copy of the production, and determined that emails with Attorney 2 and Attorney 3 had not been produced, and undersigned counsel then produced those emails.  On March 11, the government asked about Attorney 4, who worked with Attorney 1 at a firm.  Undersigned counsel informed the government that emails with Attorney 4 had already been produced.  The government then asked for emails with another person whom Mr. Loftis consulted with and who was an attorney (Attorney 5).  Undersigned counsel informed the government that emails with Attorney 5 had already been produced.  Undersigned counsel also informed the government about Mr. Loftis's interaction with another law firm and noted that documents had already been produced relating to that interaction.

9

IV.    **Mr. Loftis's Communications with Lawyers Are Admissible Because They Are Relevant to Elements that the Government Must Prove Beyond a Reasonable Doubt.**

The government's motion regarding privilege ignores its burden to prove willfulness and other state of mind elements beyond a reasonable doubt, and it ignores the relevance of Mr. Loftis's communications with attorneys towards refuting the government's allegations about his state of mind.

The government's motion is largely based on *S.E.C. v. Tourre*, 950 F.Supp.2d 666 (S.D.N.Y. 2013).  But this case has no relevance here.[4]

First, Mr. Loftis is not making the kind of argument that was of concern in *Tourre*.  There, the district court was concerned that a jury might mistakenly believe that a lawyer had "implicitly or explicitly 'blessed' the legality of all aspects of a transaction" or had "bless[ed] the sufficiency of" disclosure language.  950 F.Supp.2d at 684.  The district court thus precluded evidence that "can only be intended" to suggest that "counsel blessed the relevant disclosures."  *Id*.  Here, by contrast, Mr. Loftis is **not** arguing that Attorney 1 approved or "blessed" the arrangements that Mr. Loftis's company had with telemedicine companies and marketers in 2019.  Mr. Loftis made his own good-faith decisions about the legality of his arrangements with telemedicine companies and marketers based on all the information he received, including but not limited to the advice he received from Attorney 1, and including his good-faith belief that some of the advice he received

---

[4] The government also cites *United States v. Petrie*, 302 F.3d 1280 (11th Cir. 2002).  But that case involved a defendant who sought to call an attorney who would have testified on a point that the Eleventh Circuit said was a "non-issue in the case," because "there was no contention regarding the legality" of a particular contract, as it was the conduct and representations that the parties made that created the fraud.  *Id*. at 1287.  The defendant tried to call another attorney simply to point out that he hired a lawyer, and the Eleventh Circuit found that the district court did not abuse its discretion in excluding that attorney's testimony.  *Id*.  By contrast, the legality of contracts and arrangements is very much at issue in this case, as are Mr. Loftis's knowledge and beliefs about the legality of those contracts and arrangements, and Mr. Loftis's conversations with multiple people – lawyers and non-lawyers – are all relevant.

10

from Attorney 1 was not correct. Accordingly, there is no risk that the jury might believe that Attorney 1 blessed something that Attorney 1 did not bless.

Second, *S.E.C. v. Tourre* does not support the government's request here as the district court in that case did **not** impose restrictions like what the government is requesting here. The district court recognized that there was some danger of confusion and that it was possible that the jury might misunderstand the role of lawyers in the transaction. The district court thus said before trial that it would give a limiting instruction if the defendant "does reference the involvement of lawyers in a manner that could suggest he relied on their advice." *Id*. at 685. But the district court did **not** bar any mention of lawyers and did **not** prevent the defendant from presenting evidence that might be relevant to issues other than an advice-of-counsel defense.

Third, *S.E.C. v. Tourre* was a civil case, not a criminal case where the defendant has rights to present a complete defense. Preventing a defendant from testifying about conversations that informed his knowledge of the Anti-Kickback Statute would prevent him from defending himself against the charges here.

Fourth, *S.E.C. v. Tourre* is of little precedential value, given the Second Circuit's holding in *United States v. Scully* a few years later. As discussed above, following *Scully*, a defendant should be allowed to present evidence of legal advice that he received in support of a defense that he lacked a specific intent to defraud, did not purposefully violate a known legal duty, or otherwise acted in good faith. But the Second Circuit made clear that this does not lessen the government's burden of proof, and courts should take care to use instructions that do not "muddle[] the question of burden of proof by injecting the concept of a 'burden of production' or asserting that a defendant must 'show' or 'establish' or 'satisfy' the jury about particular facts." *Id*. at 478.

11

The government's motion appears to be based on a belief that it is relieved of its burden of proof once Mr. Loftis makes some reference to attorneys. This belief is incorrect. The Eleventh Circuit's pattern instruction on "good-faith reliance upon advice of counsel" explains that "unlawful intent" has not been proved if a defendant made a "full and complete good-faith report of all material facts to an attorney he or she considered competent," "received the attorney's advice as to the specific course of conduct that was followed," and "reasonably relied upon that advice in good-faith." Pattern Jury Instruction S18. This instruction simply explains **one** way that the government's evidence can be found lacking, not the **only** such way. *See, e.g., United States v. SpineFrontier, Inc.*, 160 F.4th 212, 223-25 (discussing "involvement-of-counsel" defense as distinct from "advice-of-counsel" defense).

In any event, whether or not some kind of advice-of-counsel instruction is ultimately given here, Mr. Loftis's communications with lawyers are relevant to the central issue of whether the government can prove beyond a reasonable doubt willfulness, intent to defraud, and knowledge of the charged conspiracies. Moreover, the government cannot claim undue prejudice given the extensive disclosures that Mr. Loftis made years ago.

Accordingly, the government's motion to preclude Mr. Loftis from testifying about his communications with lawyers or presenting evidence of such communications should be denied.

## V.     Discovery Motion Should Be Denied as Moot

The government's motion for discovery and notice should be denied as moot, as Mr. Loftis has already disclosed extensive communications with lawyers through productions, emails, and meetings with the government. To the extent that the notice needs to be updated, he will do so before trial.

## VI.    <u>Contemporaneous Emails Are Not Self-Serving Hearsay</u>

Mr. Loftis agrees with the government that "self-serving hearsay" is inadmissible, but the government's view of what constitutes "self-serving hearsay" is overly broad and misconstrues the hearsay rule to such an extent that it seeks to prevent the admission of clearly admissible evidence about his knowledge, his intent, and his state of mind.

The government's citation to *United States v. Willis*, 759 F.2d 1486 (11th Cir. 1985) is telling.  In *Willis*, a defendant (Mahdi) was interviewed at the time of arrest and made statements that were allegedly exculpatory.  The defendant then sought at trial to ask the interviewing agent about his statements.  "Obviously, the defense sought to place Mahdi's remarks before the jury without subjecting Mahdi to cross-examination. This is precisely what is forbidden by the hearsay rule." *Id*. at 1501.

But Mr. Loftis does **not** seek to admit statements that he made at the time of arrest, or statements about his innocence that he made to friends or family or others after being charged. Such statements clearly would be "self-serving hearsay" and would be inadmissible.

Instead, Mr. Loftis intends to present contemporaneous emails that he sent and received during the alleged conspiracy period, such as his emails with Individual 2, Attorney 1, Individual 3, Attorney 2, and others as discussed above.  Contemporaneous emails are **not** self-serving hearsay and should not be barred by the government's motion.  Instead, such emails and text messages are not hearsay or are covered by a hearsay exception because they are contemporaneous statements showing Mr. Loftis's knowledge and state of mind (not the truth of the underlying matters), as well as verbal acts. [5]

---

[5] *United States v. Kadir*, 718 F.3d 115 (2d Cir. 2013), a case cited by the government, does not support the government's point at all.  In *Kadir*, a defendant in a terrorism case who had been recorded by a confidential informant tried to introduce portions of one recording in which the

13

**A. Because the statements are not offered for the truth of the matter asserted, they are not hearsay.**

The rule against hearsay prohibits the introduction of out-of-court statements offered for the truth of the matter asserted. FRE 801(c). Therefore, a statement that is not offered for the truth of the matter it asserts is not hearsay and is admissible without regard to whether it complies with one of the exceptions to the hearsay rule. *United States v. Mateos*, 623 F.3d 1350, 1364 (11th Cir. 2010).

Statements admitted to show their effect on the listener, and not for the truth of what they assert, are a classic example of statements that are not hearsay. *See id.* ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay," *quoting* FRE 801(c), Advisory Committee's Note). This is true because " '[s]ometimes the relevance of words or actions to show a particular fact depends on drawing an inference that a person would not have spoken or acted in a certain way unless the person believed a certain fact to be true.' " *Id.*, quoting 5 J Weinstein and M. Berg, Weinstein's Federal Evidence § 801.10(2)(c) (2d ed. 2008).

This is true where the evidence is relevant to showing the defendant's state of mind, such as whether he possessed the relevant knowledge and intent to commit the charged crime. For example, in *Mateos*, the Eleventh Circuit held the district court erred when it excluded as hearsay a videotape of the defendant doctor's resignation during which a participant in the charged

---

defendant made "hum" responses to statements made by one of his students. The Second Circuit did not exclude those responses as "self-serving hearsay" and instead found that the defendant's responses would have been admissible if the defendant could show that they reflected his state of mind, particularly his intent. But the Second Circuit found no fault with the district court's conclusion that "hum" responses are too ambiguous to reflect what the defendant was actually thinking. Nothing in *Kadir* supports excluding contemporaneous emails that do reflect what a defendant knew and believed at times relevant to the charges.

14

Medicare fraud scheme assured her there was no fraud occurring at the facility where they worked. Because the defendant was not seeking to introduce the tape to show there was no fraud but only to show that she did not know about or participate in it, the Circuit ruled the tape was not being offered for the truth of the matter asserted and was not hearsay. *Id*. at 1364. The Circuit concluded there was no need to analyze the tape's admission as evidence of the defendant's state of mind under FRE 803(3) because "[i]f the statement is not hearsay in the first place, there is no need for it to fit within an exception to the rule against hearsay." *Id*.[6]

Statements offered to show a course of conduct are similarly not offered for the truth of the matter asserted. *See United States v. Tokars*, 95 F.3d 1520, 1535-36 (11th Cir. 1996) (victim's statements informing others that she had documents implicating her husbanding in a crime, directing they be delivered to a third party, and instructing that they be turned over to the police should anything happen to her were not hearsay where they "were offered to explain the course of conduct that occurred").

Here, Mr. Loftis's contemporaneous emails with and referring to attorneys are not offered for the truth of the matters asserted, *i.e.,* that certain statements by lawyers were correct as a matter of law or fact. Instead, they are offered solely to demonstrate that Mr. Loftis did not possess the necessary *mens rea* to be criminally liable for his conduct.

---

[6] *See also United States v. Quinn*, 123 F.3d 1415, 1420 (11th Cir. 1997) (holding district court erred in excluding sheriff's deputy's conversation with defendant concerning the defendant becoming an FBI informant because the statements were not offered for the truth that the defendant was working as an informant but as evidence that he believed he was in support of a public authority defense); *United States v. Grassi*, 783 F.2d 1572, 1577-78 (11th Cir. 1986) (extortion victim's out-of-court statements "concerning his fear of appellants and his belief that they were 'loan sharks' and connected with the mob or Mafia" were not hearsay because they were admitted "not for the truth of the information in the statements but for the fact that the victim heard them and that they would have tended to produce fear in his mind.").

**B. Even if the statements were hearsay, they are admissible as evidence of Mr. Loftis's state of mind under FRE 803(3).**

    1. <u>The statements are admissible under FRE 803(3).</u>

FRE 803(3) provides the following is not excluded by the rule against hearsay:

> A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Here, Mr. Loftis is offering the statements to show that he lacked the requisite knowing and willful criminal intent at the time the conduct charged in the indictment occurred. As the Eleventh Circuit has held, this is a permissible basis upon which to admit out-of-court statements under FRE 803(3). *See United States v. West*, 898 F.2d 1493, 1497-98 (11th Cir. 1990) (holding district court erred in excluding defendant's testimony about out-of-court statements an FBI informant made to him that were relevant to his defense that he lacked the requisite criminal intent, though finding such error harmless).

A recent case in the Sixth Circuit, *United States v. Singh*, 147 F.4th 652 (6th Cir. 2025), is instructive. There, a district court barred a defendant from introducing statements that she made during a phone call. The Sixth Circuit found that this was error and overturned the conviction in part because of this. The statements made during a phone call were about beliefs that she held at the moment that she made the statements, and thus were admissible under FRE 803(3), which excludes from the hearsay rule statements about a declarant's then-existing state of mind. So too here. Mr. Loftis's emails during the alleged conspiracy period show what he thought and did not think during the alleged conspiracy period. They are thus admissible under FRE 803(3).

In its brief, the government cites to the Fifth Circuit's opinion in *United States v. Cohen*, 631 F.2d 1223 (5th Cir. 1980). However, *Cohen* does not apply here because Mr. Loftis seeks to

introduce the challenged statements only to show his state of mind, *i.e.*, that he believed his conduct did not violate the law, and not to prove the truth of that belief, *i.e.,* that his conduct did not actually violate the law.

In *Cohen*, the Fifth Circuit upheld the district court's exclusion under FRE 803(3) of testimony that the defendant told the witnesses his co-conspirator Galkin was threatening him. *Id*. 1225. The defendant wished to introduce this evidence in support of a duress defense. *Id*. The Fifth Circuit held the rule permitted witnesses to relate out-of-court statements "to the effect that [the defendant] was scared, anxious, sad, or in any other state reflecting his then existing mental or emotional condition" for the truth of the matter asserted that he was in that mental or emotional condition. *Id*. The Fifth Circuit ruled, however, that the rule's exclusion prohibited witnesses from relating "statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind." *Id*. The Fifth Circuit thus held FRE 803(3) limited testimony to "declarations of condition – 'I'm scared' – and not belief – "I'm scared because Galkin threatened me." *Id*.[7]

The exception outlined in *Cohen* applies "only when the statements are offered to prove the truth of the fact underlying the memory or belief." *Wagner v. County of Maricopa*, 673 F.3d 977, 981 (9th Cir. 2012). Where, as here, the proponent is only seeking to prove the mental state of the declarant, but not "the fact remembered or believed," the exception does not apply. *Id*.

---

[7] Similarly, in *United States v. Samaniego*, 345 F.3d 1280 (11th Cir. 2003), an interpleader action to determine the owner of a set of championship belts, the government tried to prove an underlying fact (that the belts were stolen by a non-party) through out-of-court statements (admissions by the non-party in the course of apologizing to government witnesses). The Eleventh Circuit found that such testimony was not admissible under FRE 803(3) but was allowed on another ground. Here, by contrast, Mr. Loftis does not seek to admit emails to prove the truth of the matters asserted in them, but to show that he did not act with the state of mind required for a conviction.

Thus, where the underlying facts are not the rationale for introducing the statements, the exception in FRE 803(3) does not bar their admission.

Here, Mr. Loftis's emails with attorneys and others about the Anti-Kickback Statute in 2019 and 2020 fall comfortably within the first clause of FRE 803(3) because they are evidence of Mr. Loftis's state of mind and are not excluded by the second clause of FRE 803(3) because they are not offered to show the truth of the matters believed.

### C.  In the alternative, the statements are admissible as prior consistent statements.

The government's motion also ignores a crucial distinction in this case:  Mr. Loftis will testify in the defense case, and he will say in opening statement that he will do so.  Accordingly, his prior statements will also be admissible as prior consistent statements under FRE 801(d)(1)(B) to "rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying" or "to rehabilitate the declarant's credibility as a witness when attacked on another ground."

FRE 801(d)(1)(B)(i) does not limit prior consistent statements to only those relating to inconsistencies brought out on cross-examination.  Instead, "there need be only a suggestion that the witness consciously altered his testimony in order to permit the use of earlier statements that are generally consistent with the testimony at trial."  *See United States v. Casoni*, 950 F.2d 893, 903–04 (3d Cir. 1991); *see also United States v. Brantley*, 733 F.2d 1429, 1438 (11th Cir. 1984) (portions of prior consistent statement "that do not relate specifically to matters on which the defendant has been impeached" need not be excluded).  Moreover, a charge of recent fabrication need not be express but can be implied.  *See United States v. Reed*, 887 F.2d 1398, 1406 (11th Cir.

1989) (accusations of recent fabrication began in opening argument and continued through cross-examination of witness, justifying introduction of statement under FRE 801(d)(1)(B)).[8]

Mr. Loftis intends to testify that he did not intend to defraud Medicare, nor did he act willfully because he did not violate a known legal duty. The government claims that he did possess the requisite knowledge and intent and his statements to the contrary are untrue. Because the government necessarily must assert Mr. Loftis is fabricating his testimony concerning his state of mind, prior consistent statements that rebut that express or implied allegation are admissible.

The Court need not, and should not, wait until Mr. Loftis testifies to admit such statements but should permit Mr. Loftis to cross-examine government witnesses on the statements, subject to a later motion to strike should Mr. Loftis not testify as expected. FRE 104(b). Otherwise, Mr. Loftis will be forced to recall numerous government witnesses in his case-in-chief and remind the jury of their prior testimony, causing confusion and an undue waste of the jury's and the Court's time. Moreover, such emails will be admissible as prior inconsistent statements if government cooperators testify contrary to the contemporaneous emails and will also be admissible under FRE 106 to the extent that the government introduces part of an email string without additional emails that "in fairness ought to be considered at the same time."

---

[8]  FRE 801(d)(1)(B)(ii) also permits the admission of prior consistent statements where the witness's credibility is attacked on "another ground." Following a 2014 amendment, such statements are admitted as substantive evidence and not merely to rehabilitate the witness. Under this subsection, prior consistent statements can be admitted to rebut charges of faulty memory, to explain or modify a prior inconsistent statement, or otherwise to refute challenges to the witness's testimony, other than an accusation of recent fabrication. See *United States v. Cotton*, 823 F.3d 430, 437 (8th Cir. 2016) ("Use of a prior consistent statement to rehabilitate the credibility of a witness who has been impeached by a prior inconsistent statement is appropriate when the statement contextualizes, clarifies, or amplifies the meaning of the witness's testimony or inconsistent statement."); *see generally United States v. Purcell*, 967 F.3d 159, 196–97 (2d Cir. 2020) (explaining history and application of 2014 amendment).

## VII.    Excluding the statements would violate Mr. Loftis's right to put on a defense.

The exclusion of "crucial, relevant admissible evidence" violates a defendant's constitutional right to present a defense.  *Veltmann*, 6 F.3d at 1495, *citing Rock v. Arkansas*, 483 U.S. 44, 52 (1987).  Here, Mr. Loftis's testimony about his interactions with attorneys and his emails with and referring to attorneys are relevant and admissible, as discussed above.  They are crucial to Mr. Loftis's defense because the primary issue in this case will be Mr. Loftis's mental state: that he did not violate a known legal duty, nor did he act with an intent to defraud, and nor did he agree with anyone to commit the objects of the conspiracy counts.

Overall, his testimony and his contemporaneous emails will demonstrate that he believed the conduct in which he was engaged comported with the law, was reassured at times by people whom he trusted, and he ultimately discontinued the conduct when he determined he could no longer rely on those reassurances.  The statements are the heart of Mr. Loftis's defense, and excluding them would violate his fundamental rights.

### CONCLUSION

For the reasons discussed above, Mr. Loftis asks the Court to deny the government's motion in limine.

Respectfully submitted this 30th day of March, 2026.

<u>/s/ Stephen Chahn Lee</u>
Stephen Chahn Lee
Admitted *pro hac vice*
Attorney for Defendant
Law Office of Stephen Chahn Lee, LLC
209 S. LaSalle St, Suite 950
Chicago, IL 60604
312-436-1790
slee@stephenleelaw.com

20