UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

UNITED STATES OF AMERICA          )
                                  )
        v.                        )          CASE NO: 6:25-CR-350-PGB-RMN
                                  )
MARK LOFTIS                       )

**DEFENDANT'S MOTION IN LIMINE
REGARDING THE ANTI-KICKBACK STATUTE**

The government's case is based in part on legal theories that courts have rejected in other cases. Two years ago, the Fifth Circuit Court of Appeals found in a criminal case that much of the conduct that the government believed violated the Anti-Kickback Statute (AKS) was not illegal.[1] And over the past year, the Seventh Circuit Court of Appeals overturned the conviction of one business owner for alleged violations of the AKS, and the government then agreed to vacate the conviction of a marketer who pled guilty to an AKS conspiracy in a related case, acknowledging that this marketer (who served time in federal prison) is actually and factually innocent.[2]

Given this history, it is important for the Court to determine pre-trial what the relevant law is regarding the AKS, provide clear pre-trial instructions to the jury concerning the AKS, and preclude improper testimony and argument from the government concerning AKS theories similar to those it has elicited in other cases and that it presented to the grand jury that returned the indictment in this case. Defendant Mark Loftis requests that this Court (A) make a pretrial determination of the pertinent legal requirements of the AKS; (B) give a pretrial instruction to the jury regarding key AKS concepts; (C) preclude the government from making arguments and

---

[1] *United States v. Marchetti*, 96 F.4th 818 (5th Cir. 2024)
[2] *United States v. Sorensen*, 134 F.4th 493 (7th Cir. 2025) and *O'Neil v. United States*, 25 CV 10065 (N.D. Illinois), Docket #1 (filed on August 22, 2025).

1

statements that misstate the law; (D) review *in camera* the government's legal statements to the grand jury; (E) preclude government cooperators from testifying about their current understanding of the law; (F) preclude government cooperators from testifying that they pled guilty to the same conduct for which Mr. Loftis is on trial; (G) permit alleged coconspirators to testify about their understanding of the law at the time the alleged crimes were committed so long as any remaining attorney-client privilege is waived; and (H) read a limiting instruction to the jury whenever testimony about the law conflicts with the court's instructions.

## I.    Background

### A.    Legal Background

In recent years, the Fifth and Seventh Circuits have invalidated the government's theory of what conduct violates the AKS, specifically in cases involving payments to marketers.

In *United States v. Sorensen*, 134 F.4th 493 (7th Cir. 2025), the Seventh Circuit held that paying marketers for "doctor's orders" was not a violation of the AKS when there was no evidence the marketers made choices about medical orders or about the choice of provider. *Sorensen* expanded upon a ruling by the Fifth Circuit Court of Appeals in *United States v. Marchetti*, 96 F.4th 818 (5th Cir. 2024). In *Marchetti*, the Fifth Circuit distinguished between payments for marketing (which are legal) and payments for referrals (which are prohibited by the AKS). The key distinction is that the payments must have been intended to "improperly" "influence those who make healthcare decisions on behalf of patients" for them to violate the AKS. 96 F.4th at 827.[3]

---

[3] To the extent that the government tries to distinguish the *Sorensen* case as limited to the parts of the Anti-Kickback Statute that specifically use the word "refer" (42 U.S.C. § 1320a-7b(b)(1)(A) and (b)(2)(A)), the indictment in the *Marchetti* case alleged four separate objects of the conspiracy at issue, each a different subsection of the Anti-Kickback Statute. Two of the four subsections use the word "refer," and two do not. The Fifth Circuit drew no distinction in the *Marchetti* opinion between the different objects and focused on whether the defendant was a relevant decisionmaker or improperly influenced relevant decisionmakers.

The Eleventh Circuit has not yet overturned a conviction for violating the AKS, but the convictions it has affirmed differ markedly from *Sorensen* and *Marchetti* because the government showed the person being paid was in a position to make medical decisions on behalf of patients or physicians (rather than a marketer). In *United States v. Vernon*, 723 F.3d 1234 (11th Cir. 2013), the Eleventh Circuit sustained a conviction because the defendant paid a person who was "effectively responsible for deciding which specialty pharmacy to use for the filling of her … patients' prescriptions" and was given control over referrals by her patients.[4] In *United States v. Young*, 108 F.4th 1307 (11th Cir. 2024), the Eleventh Circuit sustained a conviction because the defendant paid someone who had "the ability to determine where patients' prescriptions would be filled" and was a "relevant decisionmaker with the ability to direct prescriptions."

Overall, under these cases, the form or structure of the payment does not control whether the payment arrangement violates the AKS. Thus, the government cannot prove an AKS violation simply by showing that a payment arrangement was percentage-based or based on the number of orders. The *Marchetti* and *Sorensen* cases are also clear that invoices that incorrectly state the basis for payment do not, in and of themselves, make the underlying payment arrangement illegal, as both cases involved what the government considered "sham" invoices. What matters is whether the payments were intended to improperly influence those who made medical decisions on behalf of patients or physicians, which is the fundamental ill the AKS was enacted to prevent.

---

[4] As with *Marchetti*, the indictment at issue in *Vernon* alleged violations of the AKS that specifically used the word "refer" and those that did not. The Eleventh Circuit made no meaningful distinction on this basis in its reasoning.

**B.      Factual Background Relating to This Case**

The conspiracy to violate the AKS charged in this case is primarily based upon payments by Mr. Loftis's companies Back Pain Home Supplies ("BPHS") and LJM Health Group to "co-conspirator marketers" (Indictment ¶ 37(d)) and to "co-conspirators" who "arrang[ed] for medical providers to engage in purported telehealth consultations and sign orders for braces" (Indictment ¶ 37(e). However, Mr. Loftis did not know or intend that any of the payments at issue would influence a provider's or patient's medical decisions. Therefore, they did not violate the AKS.

The government's allegations do not take into account the specific arrangements that Mr. Loftis's companies had with different companies, and the government's allegations do not take into account significant changes in how Mr. Loftis's companies operated over the period from September 2017 through October 2020. There were significant changes, as reflected in the graph below, which shows large payments for durable medical equipment ("DME") during the "Telemed Project" period that was run by Individual 2 (who ran a billing company referred to in the indictment as Company 2), a pause in and around April 2019, a short period where BPHS continued to bill Medicare for braces, and then a change to continuous glucose monitors:



The government's allegations also do not take into account Mark Loftis's reliance on Individual 2. Mark Loftis is licensed as a chiropractor and became an enrolled Medicare provider in 2015. In 2016, on the advice of Individual 2, Mr. Loftis incorporated BPHS to provide durable medical equipment, such as braces and other orthopedic equipment, to his patients. Initially, if Mr. Loftis saw a patient whom he believed needed DME, he would recommend DME to the patient's primary-care physician or a nurse practitioner with whom he contracted. If the physician or nurse ordered DME, BPHS would supply the DME and bill the patient's insurance. The government appears to do not find any fault in Mr. Loftis's work with Individual 2 during this period.

1.      <u>Individual 2's "Telemed Project" (September 2017 to April 2019)</u>

BPHS's business changed in the fall of 2017, when Individual 2 told Mr. Loftis about a "Telemed Project" that Individual 2 had developed, explaining it was a way to expand BPHS's business by using telemedicine doctors and marketers who allegedly did AKS-compliant marketing. Initially, Individual 2 set up the project on his own with little involvement from Mr. Loftis. In 2018, Mr. Loftis began to work more closely with Individual 2 and his marketers, including Prizm Media (Prizm) and True Alliance Health Group (True Alliance).

a.      *Prizm (2018)*

In April 2018, Prizm Media, which was operated by government cooperators Salma Karina Hayat and Zeeshan Hayat, sent Individual 2 and Mr. Loftis materials about how Prizm's orthotic brace lead generation process worked. An excerpt of those materials is reproduced below and shows that Prizm represented that potential patients would respond to advertising and would be contacted only if they opted into being contacted. Nothing in the process as described to Individual 2 and Mr. Loftis indicated that Prizm would make any decisions on behalf of the patient or the physician that ordered braces for the patient.



Individual 2 told Prizm BPHS was interested in a Spanish-speaking pilot, and Individual 2 negotiated a "trial pilot" of "15 leads or $6,000" With the agreement that, if a lead provided by Prizm was for a patient who had already received a similar product or who refused delivery, Prizm would provide another lead instead.[5]

Prizm sent BPHS a "marketing services agreement" with three statements of work: (1) an "Inquiry Identification Agreement" covering "marketing services to generate interest from consumers in Company's products and services," (2) a "Call Center Services" agreement covering calls made to "prospective Customers," and (3) a "Prescription Services Agreement" covering telemedicine services that would be provided for patients who chose to have their requests for braces evaluated by a telemedicine doctor rather than their primary-care physician.

---

[5] Based on its arguments in other cases, the government appears to believe that paying for leads and then requesting replacements for unsuccessful leads violates the AKS. Like its other arguments, this theory appears to prioritize payment structures, not whether payments improperly influenced medical decisions, and this theory is not supported by *Marchetti*, *Sorensen*, *Young*, or other cases.

Individual 2 discussed the agreements with Mr. Loftis, who agreed to move forward with Prizm.[6]

As BPHS worked with Prizm, Individual 2 and Mr. Loftis raised concerns with Prizm about the medical records that were being provided, including the thoroughness of the notes that supported the medical necessity of the braces that doctors were ordering for patients.  On or about July 20, 2018, Mr. Loftis cancelled the Prizm contract effective August 2018 and told Prizm by email that the issues were "documentation by the doctors" and "turnaround time."

Throughout the arrangement, Prizm sent BPHS invoices, beginning with an invoice dated May 4, 2018 for "pharmacy marketing services – orthotic braces (contract agreement)" for $6,015, that Mr. Loftis paid.  His understanding was that Prizm was conducting the marketing, call center, and prescription services that Prizm had described and was not making any decisions on behalf of patients or physicians.

b.      *True Alliance Health Group*

In November 2018, Individual 2 contacted True Alliance, a marketing company run by William Novack, and BPHS entered into two agreements with True Alliance: (1) a "Marketing Services Agreement" under which True Alliance would "provide a specialty marketing program to generate and deliver Raw Leads," with Raw Leads defined as a person who "has initiated contact through the specialty marketing program to receive more information on the (sic) regarding Client's DMEPOS products, and (2) a "Business Process Outsourcing and Call Center Services

---

[6] As referenced in Mr. Loftis's response to the government's motion regarding privilege and "self-serving hearsay" (Docket #45), a representative of Prizm provided Individual 2 and Mr. Loftis an opinion letter by a lawyer and a presentation that purported to have been prepared in part by a lawyer.  Whether these documents were true or not, they are relevant to whether Mr. Loftis acted willfully in terms of this arrangement.

Agreement" under which True Alliance would make calls to those people whom Mr. Loftis believed had opted into receiving such calls and to coordinate with the patients' primary-care physicians or with telemedicine doctors as the patient chose.

On November 19, 2018, True Alliance sent Mr. Loftis a "sample opt in" as an example of how True Alliance operated:



In fact, based on the plea agreement Novack entered in a separate case in the Middle District of Florida, 6:19-CR-247 (Docket #3), True Alliance lied when describing its process and services to Mr. Loftis. According to Novack's plea agreement, True Alliance "purchased, in bulk" "sham prescriptions from the telemarketing companies" that cold-called Medicare beneficiaries and created false documents about such people. According to the plea agreement, True Alliance then "funneled many of the sham prescriptions" to DME companies that Novack operated, and then "sold the remaining sham prescriptions to other DME companies at a profit."

Mr. Loftis made payments to True Alliance on behalf of BPHS from November 2018 to January 2019. He understood True Alliance was conducting the marketing and other services it had described, and he did not believe True Alliance was making any decisions on behalf of patients or physicians.

2.      New Model in 2019

In early 2019, Mr. Loftis thought that he could improve the model Individual 2 had developed by taking over marketing efforts himself.  He set up LJM Health Group to purchase leads generated by TV advertising and use a call center to follow up on those leads.  He also entered into an agreement with a telemedicine company to whom the patients identified by his marketing efforts were referred.  Individual 2 was involved with some of these arrangements in early 2019, but Mr. Loftis stopped working with Individual 2 in and around April 2019, when Mr. Loftis heard about a federal law-enforcement takedown that was called "Operation Brace Yourself" and that raised concerns about some of Individual 2's advice.

a.      *Company 3*

LJM Health Group worked with Company 3 to handle the marketing and lead generation services that companies like Prizm and True Alliance had previously provided.

On April 2, 2019, a representative of Company 3 represented that the company "runs our commercials nationwide" and they could provide "Medicare DME TV leads, customers who are looking for back, knee and orthotic braces."  BPHS signed an agreement under which Company 3 would provide "valid leads," meaning "patients or loved ones who have called into our I[nteractive] V[oice] R[esponse] through our TV commercial with a valid phone and indicated they have Medicare and have expressed interest in all orthotic braces that include ankle, wrist and shoulder and back and knee braces."  Company 3 represented that opt ins specific for BPHS were played, and thus leads would be exclusive to BPHS.

Beginning in April 2019, BPHS agreed to pay Company 3 $33 per lead.  Mr. Loftis understood that he was paying Company 3 based on the number of leads that the company

9

provided. He understood Company 3 was conducting the advertising services that it had described and that it was not making any decisions on behalf of patients or physicians.

> b.   *Summit Marketing Solutions*

Mr. Loftis also worked with Summit Marketing Solutions, Inc. (Summit), which was associated with government cooperator Arthur Henderson, to provide the follow-up calls that Prizm and True Alliance had previously undertaken. Mr. Loftis signed a service contract in March 2019 with Summit, and Summit then made calls based on the leads provided by Company 3.

BPHS agreed to pay $1,750 per agent per week, with the understanding that this price would cover the cost of a person making calls and a management fee. Mr. Loftis's understood that he was paying for call center services and that Summit was not making any decisions on behalf of patients or physicians.

> c.   *Medtech*

In 2019, Mr. Loftis also entered into agreements with Medtech Worldwide, which was operated by government cooperator Marc Sporn, and Company 4. Mr. Loftis's understanding was that physicians would use the Medtech software to consult with patients who had responded to the advertising by Company 3 and the follow-up calls by Summit and who wanted to be evaluated by a telemedicine physician.

Mr. Loftis understood that he was paying Medtech and Company 4 based on the number of consultations and verifications that were done. He believed MedTech and Company 4 were performing the services they represented and that neither company was making any decisions on behalf of patients or physicians.[7]

---

[7] As referenced in Mr. Loftis's response to the government's motion regarding privilege and "self-serving hearsay" (Docket #45), a representative of Medtech represented that lawyers had approved

Mr. Loftis understood that this overall system resulted in orders for braces that BPHS would fill and would bill.  He also used this system on behalf of other companies that retained LJM Health Group.

    d.  *Prizm (2019)*

Separate from the "telemedicine" model, Mr. Loftis used a "doctor chase" model that was intended to get orders from patients' primary-care physicians, not from telemedicine doctors.[8]  In September 2019, Mr. Loftis on behalf of BPHS entered into a new agreement with Prizm in this regard.  BPHS signed two agreements as before – an "inquiry identification agreement" and a "call center services" agreement.  He also signed a "Document and Record Retrieval Services" statement of work and understood that Prizm would contact patients' primary-care physicians and attempt to get signed orders from those doctors.

Prizm sent BPHS an invoice dated September 20, 2019 for $15,000 total, broken down into (1) $9,750 for "marketing services – orthotics docs," (2) $3,750 for "call center services," and (3) $1,500 for "document and record retrieval services."  Mr. Loftis paid the invoice and understood Prizm was conducting the marketing, call center, and document and record retrieval services that it had described and that Prizm was not making any decisions on behalf of patients or physicians.

---

Medtech's operations.  Whether this was true or not, this is relevant to whether Mr. Loftis acted willfully in terms of this arrangement.

[8] This model was used by multiple DME companies in the relevant time period.  Notably, in the case of Craig O'Neil, the marketer whose conviction was vacated in light of the *Sorensen* case, the district court asked the government at sentencing if there was "nothing wrong" with the model if O'Neil had been paid by the hour instead of on a percentage basis, and the government agreed.  The court summarized, it "may not be the best way to run a medical office" and it "doesn't seem like a great idea, but it's not a crime" in terms of the Anti-Kickback Statute.  O'Neil Sentencing Tr. 49.  Later, the government agreed that O'Neil was innocent, and his conviction was vacated.

In November 2019, Mr. Loftis was frustrated with Prizm's work and consulted an attorney, Attorney 1, who raised concerns about whether the payment terms with Prizm violated the AKS.[9] Mr. Loftis then wrote an email to Prizm as follows:

> My Attorney [Attorney 1] is familiar with your model. We have bigger issues as of this morning. He stated that because in reality you are charging per HCPCS code the Agreement is invalid and would be considered a 'sham' Agreement by prosecutors and therefore is not enforceable or legal. He states it is a direct violation of AKS. For my compliance I demand a full refund. I expect confirmation of this refund today. I am beginning to get very concerned over this model this is new information to me.

Karina Hayat of Prizm, who is now cooperating with the government, responded that "you're welcome to have your attorney reach out as we stand on our contracts, and the services performed." Ultimately, Mr. Loftis agreed to finish the work with Prizm that had already been paid for. He did not make any further payments to Prizm and ended the relationship soon afterwards in or around December 2019.

### 3. Continuous Glucose Monitoring Devices

In late 2019 through 2020, BPHS also provided continuous glucose monitoring devices to patients by sending order forms to a prospective patient's primary care doctor. Telemedicine doctors were not involved with these prescriptions.

### 4. Summary

As the evidence at trial will show, the agreements that BPHS had with marketers, call centers, administrative service providers, and telemedicine companies were not illegal on their face, and the representations the companies made to Mr. Loftis about how the companies would operate described practices that did not violate the AKS based on the holdings in cases such as

---

[9] Whether or not Attorney 1's opinion was correct in light of the "relevant decisionmaker" cases discussed herein is for the Court to decide, not the jury.

*Marchetti*, *Sorensen*, *Vernon*, and *Young*.  Mr. Loftis believed the companies were operating according to the terms of their agreements and representations to him; he neither knew nor intended that any of companies would make medical decisions themselves or would improperly influence a provider or patient in the medical decisions they made.

Moreover, as Mr. Loftis himself will testify at trial, he believed that the payments to marketers, call centers, administrative service providers, and telemedicine companies were legal and did not violate the AKS.  Mr. Loftis understands the Court cannot dismiss the indictment based on his representations about what the evidence will show.  However, as discussed above, the government has taken the position in previous cases that the AKS prohibits the conduct at issue here under a theory that courts have ruled is invalid, i.e., that the mere payment for doctors' orders violates the AKS regardless of whether it was intended to influence a provider's or patient's medical decision and regardless of whether the company receiving the payment was even *capable* of influencing that decision.  Mr. Loftis respectfully requests the Court grants the relief detailed below to prevent the jury from being exposed to highly prejudicial evidence and argument that has little, if any, probative value and that can only serve to confuse the jury and waste its valuable time.

II.     **Motions**

    A.     **Motion for pretrial determination of the pertinent legal requirements of the AKS.**

As discussed in his Motion (ECF 31), following *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), the interpretation of the AKS is a legal issue for the Court to decide without deference to the government and its agencies' interpretation of the statute.  As discussed in his prior motion, Mr. Loftis requests the Court make a pre-trial determination of the legal requirements of the AKS.  In particular, given the government's and its agencies' history of misinterpreting the AKS's requirements, there is a high risk the government will introduce evidence and make

arguments reflecting an erroneous interpretation of the AKS that would be highly prejudicial, confusing to the jury, a waste of valuable trial time, and, ultimately, may require a mistrial.

### B.      Motion for a pretrial instruction to the jury regarding AKS requirements.

This case does not involve an easily-understood crime such as robbery or bank fraud, where the average juror can be expected to know the defendant cannot take property from someone without her permission or lie to get money from a bank.  Accordingly, without preliminary instructions at the beginning of trial, the jury will be expected to listen to testimony and view evidence without knowing what the AKS actually prohibits.  If jurors do not know, for example, that it is not illegal to pay a doctor per DME order but that it would be illegal to pay a doctor if the payment was intended to improperly influence the doctor's medical judgment, they may not appreciate the significance of testimony and evidence on this issue.  This danger is particularly acute if witnesses are permitted to testify, and the government is permitted to assert, understandings about the law that courts have found to be wrong and that may contradict the Court's final instructions at the close of trial.

Accordingly, Mr. Loftis asks the Court to provide instructions to the jury at the beginning of the trial about what conduct at issue in the trial the AKS does and does not prohibit.  The following proposed instructions are based on cases such as *Sorensen*, *Marchetti,* and *Young*:

- In order to convict Mr. Loftis of violating the Anti-Kickback Statute, the government must prove beyond a reasonable doubt:
    (1) Mr. Loftis made a payment to a person or company;
    (2) The person or company was a 'relevant decision maker,' that is the person or company was capable of making medical decisions on behalf of medical providers or patients; and
    (3) Mr. Loftis acted with the intent to improperly influence medical decisions made by or on behalf of the relevant decisionmaker.

- A violation of the Anti-Kickback Statute is a crime only if one acts "willfully" in making such payments.  The word "willfully" means that a person knew of his conduct and acted purposefully with an intent to defraud and to violate a

known legal duty.  For Mr. Loftis to be found that he acted "willfully," the government must prove that he had knowledge at the time he allegedly committed the crime that his conduct was illegal.  It is not enough for the government to prove Mr. Loftis "should have" known his conduct was illegal, or even that he was aware of a high probability that it was.

- Paying for marketing services or for doctors' orders alone is not a violation of the Anti-Kickback Statute.

Without such preliminary instructions, jurors might wonder if Google violates the AKS whenever it is paid to run an online ad, or if a doctor violates the Anti-Kickback Statute by paying an office manager whose duties include processing or sending out medical orders.  The Anti-Kickback Statute does not reach so far, and the jury should be given instructions to make that clear.

**C.    Motion to preclude the government from making arguments and statements that misstate the law.**

Mr. Loftis also requests the government be precluded from making arguments or statements to the jury that misstate the law.  In particular, the government should be precluded from saying that this is a case about violating the AKS by "paying for orders" or "buying doctor's orders."  The government has used similar phrases in other cases.  A discussed above, such overly simplistic formulations are legally incorrect. Given the nuanced evidence that will be presented in this case, and the centrality of Mr. Loftis's state of mind to his defense, permitting the government to truncate its description of what the AKS prohibits will lead to confusion and undue prejudice.

This concern unfortunately is not hypothetical.  When the government presented evidence to the grand jury that returned the indictment in this matter, the prosecutor asked a government cooperator if it was "against the law to sell doctors' orders," and the cooperator said that it was. The government also asked the cooperator a series of questions – "Is it okay to sell doctors' orders," "Is it okay to purchase doctors' orders," and "Is it okay to bill Medicare for doctors' orders that were purchased and sold" – and each time the cooperator said that it was not okay.  The government

likely provided instructions to this effect to the grand jury, though those instructions have not been disclosed.

But if a marketer was not a relevant decisionmaker, then payments to the marketer are not a crime, whether or not the government characterizes the payments as being for "selling" or "purchasing" doctors' orders. The government should be precluded under FRE 403 from making improper arguments that mischaracterize the law and thus would be confusing to the jury and unduly prejudicial to Mr. Loftis.

D. **Motion requesting the Court to conduct an *in camera* review of the grand jury transcripts in this matter to determine if there are potential grounds for dismissal of the indictment.**

As discussed above, there is reason to believe that the government misstated the law to the grand jury that returned the indictment in this case. Accordingly, Mr. Loftis asks the Court to conduct an *in camera* review of the transcripts of the government's interactions with witnesses and the grand jurors, including the instructions that it provided the grand jurors concerning the governing law. If the government did make misleading or inaccurate statements of law, then the Court should order disclosure to Mr. Loftis under FRCrP 6(e)(3)(E) so that he can file a motion to dismiss the indictment.

E. **Motion to preclude the government's cooperating witnesses from providing opinions about their current understanding of the law.**

Given the complicated legal landscape here, under FRE 401 and 403, government cooperating witnesses should not be allowed to testify about their *current* legal opinions concerning the AKS, including whether a particular payment is a "kickback" or was illegal. Allowing witnesses to testify to their *current* opinions on the law would have very little, if any, probative value, since it is Mr. Loftis's understanding of his legal duty in the 2017-2020 time period that is at issue in the case, not what the cooperators understand about the law in the present

16

day.  This is particularly true where the witnesses developed their understanding of the law based on information obtained from the government and its agents after they learned they were under investigation.  Such testimony would be highly prejudicial, confusing to the jury, and would waste valuable court time, particularly where those opinions conflict with the law the Court provides to the jury.  The testimony should, therefore, be precluded under FRE 403.

Furthermore, Mr. Loftis will not be able to fully test such opinions on cross-examination. First, Mr. Loftis is unable to cross witnesses about their conversations with their lawyers and so cannot test how the witness's beliefs and understandings about the AKS may have developed over time in response to conversations with their counsel about which Mr. Loftis cannot cross-examine them.  Second, the government's reports do not disclose what the government *told* the witnesses or their lawyers about the AKS; they only disclose what the witness said *to* the government.   Mr. Loftis, therefore, cannot explore whether government cooperators did not actually believe their conduct was illegal until they were told by the government that it was and are testifying to this newfound belief in the illegality of their conduct to curry favor with the government in the hope of receiving a reduced sentence.

This scenario unfortunately is not just theoretical.  In the *Marchetti* case, co-defendant Phillip Lamb pled guilty to conspiracy to violate the AKS and testified about how he came to believe that his company's arrangement with a marketer violated the statute.  But the Fifth Circuit held that this arrangement did not actually violate the AKS.  Mr. Lamb recently filed a 28 U.S.C. § 2255 petition to vacate his conviction.  Among other things, he points out how his belief about the AKS was influenced by the government.

> Prior to the Fifth Circuit's *Marchetti* and *Donofrio* decisions and prior to his plea of guilty, Mr. Lamb was made aware that the government consistently took the position that Vantari's percentage-based compensation to advertisers (i.e., a "commission" payment

structure) alone was sufficient to violate the AKS. In addition to the prosecutors' arguments throughout this case, it was evident in discovery material provided by the government that it believed that a percentage-based compensation model alone violated the AKS. Only three of the government's interview sessions were recorded and made available in discovery. Yet in all three recorded interviews attended by the two lead investigators and at times by an AUSA on the prosecution team, there are numerous examples of government agents' misstatement of the law. While the following examples are not in Mr. Lamb's factual basis, they do exemplify the consistent pattern of misstatement of law that formed the basis of Mr. Lamb's thought process in deciding to plead guilty.

*United States v. Lamb*, 5:19-CR-25 (E.D. Texas), Docket #1117 (filed February 24, 2026) at 8.

Mr. Lamb's petition goes on to quote law-enforcement agents' incorrect beliefs about what is illegal under the Anti-Kickback Statute:

- "And for us it is illegal to pay these sales reps on the federal business a percent of your collection. Straight up that's a violation of the Anti-Kickback Statute."
- "[A] percentage-based, volume-based compensation model for salespeople is bad, bad, bad news. Now, there's safe harbors you could fit in, but suffice to say that we're sitting here because the way that Vantari compensated its salesforce was not compliant and it was, it ran afoul of federal healthcare laws."

*Id*. at 8-9.

The government has not provided similar recordings of interviews in this case, and the interview reports do not disclose whether law-enforcement agents made similar statements while interviewing cooperating witnesses or talking with the witnesses' lawyers. Even so, there is a real risk that the cooperators whom the government plans to call in this case were similarly influenced by the government's misstatement of law, and the Court can mitigate this risk by precluding the government witnesses from testifying as requested herein.

Moreover, limiting the government witnesses' testimony will streamline the trial significantly and avoid wasting time on irrelevant issues. If the government witnesses testify about their knowledge of the AKS and about their belief that they violated the AKS, Mr. Loftis will likely

18

have to engage in extensive cross-examination to clarify what the witnesses actually believed and how they came to such beliefs.  Mr. Loftis will also have to cross-examine the witnesses about their understandings of the Eleventh Circuit's *Vernon* and *Young* opinions, as well as their understandings of the *Marchetti* and *Sorensen* opinions.  This will be very confusing and will take up significant amounts of time that have nothing to do with one of the core issues in this case – whether *Mark Loftis* acted with knowledge that his conduct violated the AKS.

**F.      Motion to preclude the government cooperators from testifying that they pled guilty to the same conduct for which Mr. Loftis is on trial.**

Government cooperators should be precluded under FRE 403 from testifying that they violated the AKS or pled guilty to charges involving the AKS because such evidence is unduly prejudicial and confusing.  This approach is supported by cases such as *United States v. Harrell*, 436 F.2d 606, 614-15 (5th Cir. 1970).  There, the Fifth Circuit reversed a conviction in which a witness testified, over the defendant's objection, that he had pled guilty to the same conspiracy charge that the defendant on trial was contesting.  In particular, the Fifth Circuit noted that the witness's guilty plea was "no more and no less than an inadmissible hearsay statement – made long after the conspiracy had ended – that he and Harrell had indeed conspired together as the indictment charged."  436 F.2d at 614-15.  Moreover, the Fifth Circuit cast significant doubt on whether there was any valid evidentiary purpose in eliciting such hearsay.  "[W]e think that the evidentiary purpose ordinarily to be served by proof of a co-defendant's plea of guilty is so shadowy, so insubstantial that it would be the better practice in run-of-the-mill cases to exclude such proof altogether."  Id. at 617.

In *United States v. King*, 505 F.2d 602 (5th Cir. 1974), the Fifth Circuit recognized that the introduction of a witness's plea should only occur when there is a legitimate evidentiary purpose:

> We recognize that there is potential prejudice inherent in a witness' statement that he was the defendant accomplice or co-conspirator, and that he has pled guilty to the crime for which the defendant is charged. One person's guilty plea or conviction may not be used as substantive evidence of the guilt of another. The introduction of a codefendant's guilty plea is permissible, however, when its use is limited to proper evidentiary purposes such as to impeach trial testimony or to reflect on a witness' credibility.

*Id*. at 607.

The Fifth Circuit found in *King* and other cases that there was an evidentiary purpose to eliciting a witness's plea when the defendant attacks the witness as a bad person who is lying to help the government.  In *King*, the Fifth Circuit found that the defendant's counsel had made references to the witness's criminal record which "injected" the witness's record into the case, making it "almost essential for the prosecution to bring out [the witness's] convictions on direct examination."  505 F.2d at 608-09.  In *United States v. Medina-Arellano*, 569 F.2d 349, 356-57 (5th Cir. 1978), the Fifth Circuit found that the defense had "followed the usual pattern for this kind of case" and portrayed the witness as a "bad person" who had "invented lies," thus allowing the government to bring out the witness's record to "preempt a defense attack on [the witness's] credibility."

This case, however, is not typical.

While government witnesses may have believed at the time of their guilty pleas that they had violated the AKS, it is not clear that they *actually* violated the law or that they believed they had done so prior to being informed – incorrectly – by the government that they had.  Mr. Lamb's example in the case related to the Fifth Circuit's *Marchetti* opinion is instructive.  Mr. Lamb believed at the time of his guilty plea that he had violated the AKS and believed when he testified that he had, but he was not actually violating the law, and it is not clear that he held his incorrect

belief prior to the government providing him what turned out to be incorrect legal information to induce his plea and cooperation.

In this case, there is some reason to doubt the validity of the pleas of the government's cooperators.  For example, the Hayats' plea agreements refer to Prizm itself receiving "illegal kickbacks and bribes" from a DME company "in exchange for furnishing signed DME brace orders."  Under *Marchetti*, *Sorensen*, *Vernon*, and *Young*, such payments would be illegal only if Prizm itself was in a position to make medical decisions and was induced by such payments to make those decisions a certain way. Nothing in the plea agreements indicates that Prizm meets either requirement.  To the extent that the Hayats believed such payments violated the AKS, they may well have been wrong.  Moreover, the Hayats' plea agreements state that they conspired to violate the AKS beginning in or around April 2016, but Karina Hayat herself told the government in an interview that she did not know that what she was doing was illegal until late 2017 or early 2018.  Either she was lying in that interview, or she made a false statement in her plea agreement. If Karina Hayat did not know what she was doing was illegal until 2017 or 2018, she could not have conspired to violate the AKS in 2016, since willfulness is an element of that offense. Ultimately, the government witnesses' current beliefs about whether their conduct violated the AKS are of little use and relevance in this trial, which focuses on Mark Loftis.

In addition, precluding witnesses from testifying that they pled guilty to a conspiracy charge will avoid the potential confusion and prejudice that would ensue from the jury not fully understanding that, even though the witnesses pled guilty to violations of the same statutes involving some of the same conduct, the witnesses were convicted of different conspiracies than the ones charged in Counts One and Two.  The idea that the witness admitted to committing the same crime with which the defendant is charged is such a powerfully prejudicial concept that it is

difficult to imagine a limiting instruction could be crafted that would dispel the considerable undue prejudice that would result.

Mr. Loftis states affirmatively that he will not seek to attack the government witnesses' credibility on the basis that they pled guilty specifically to conspiracy to violate the AKS or any conspiracy charge. "When the defendant agrees [in a motion in limine] not to question the government's witness about the guilty plea or plea agreement or to use the plea to impeach the witness's credibility, then the government is left with no legitimate purpose in using the guilty plea during direct examination." *United States v. Kroh*, 915 F.2d 326, 337-38 (8th Cir. 1990) (dissenting opinion).

Mr. Loftis has no issue with government cooperators testifying that they pled guilty to an unspecified felony and are testifying in the hope of obtaining leniency at sentencing. This would sufficiently address a legitimate evidentiary purpose without causing undue prejudice. This would also be consistent with Pattern Criminal Jury Instruction S1.2, which refers to the fact that a government witness has a plea agreement with the government without specifying the charge.

### G.     Motion to allow alleged co-conspirators to testify about their past understanding of the Anti-Kickback Statute and the bases for such understanding so long as any remaining privilege is deemed waived

While alleged co-conspirators' *current* understandings of the AKS are irrelevant and should be precluded, what each believed and understood about the AKS *during the time period covered in the indictment* is highly relevant and should be admitted. To conspire to violate the AKS, one must act *willfully*, meaning one must know at the time that his or her conduct violated the AKS or is at least illegal. Accordingly, if someone alleged to have conspired with Mr. Loftis did not understand that conduct violated the AKS, then that person did not act willfully and Mr. Loftis cannot be guilty of conspiring with them. *See United States v. Wieschenberg*, 604 F.2d 326 (5th Cir. 1979) ("in order to sustain a judgment of conviction on a charge of conspiracy to violate a

22

federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself.' ") (*quoting United States v. Feola*, 420 U.S. 671, 686 (1975).).

For example, it is critical to determine when and how people like Karina Hayat came to believe that their conduct was illegal.  May 2018 is a critical month in this case, as the AKS conspiracy charged in Count Two allegedly begins in May 2018, which was the month that BPHS agreed to work with Prizm and was shortly after Prizm had provided a legal opinion letter about the compliant nature of Prizm's operations.  Did Karina Hayat believe at that time that Prizm was operating unlawfully?  If so, then she provided false information to Individual 2 and Mr. Loftis, inconsistent with the charged conspiracy.  And if not, then she did not act willfully at the time that the alleged conspiracy began.

Moreover, the alleged co-conspirators should be required to answer questions about their conversations with lawyers during the alleged conspiracy periods.  As discussed above, Karina Hayat at Prizm represented to Mr. Loftis in late 2019 that lawyers had approved Prizm's payment arrangements.  If she was lying about this critical fact, then this undercuts the charged conspiracy – it is hard to see how Ms. Hayat and Mr. Loftis agreed to willfully violate the AKS when she either believed lawyers had concluded the payments did not violate the AKS or lied to Mr. Loftis about the lawyers' approval to induce him to continue the agreement under false pretenses.

Finally, to the extent that Karina Hayat or other government witnesses intend to assert a privilege over any such conversations, the government should discuss this with their cooperators and inform Mr. Loftis and the Court before trial.  The Court can then make determinations before trial whether any such privilege still exists at this time, and the Court can determine whether permitting the cooperators to testify without allowing Mr. Loftis to probe their conversations with counsel would be unduly prejudicial and violate his constitutional right to put on a defense.

23

**H.**     **Motion requesting limiting instructions throughout the trial whenever evidence is presented that misrepresents or misconstrues the law.**

The Court should provide instructions throughout the trial when a witness testifies about a belief about the AKS that is not correct.  This will help avoid jury confusion.  For example, if a witness says that he or she had the belief at some relevant time that a percentage-based arrangement was illegal, the Court should instruct the jury that this is not correct and that a percentage-based arrangement violated the AKS only if it was intended to improperly influence patients or doctors in making medical decisions.  In addition, if the November 2019 discussions between Mr. Loftis and Prizm are presented at trial, the Court should instruct the jury that Attorney 1's opinion would be incorrect if Prizm was not a relevant decisionmaker and if the payments were not intended to improperly influence Prizm's medical decisions.

## CONCLUSION

For the reasons discussed above, Mr. Loftis asks the Court to grant the relief requested herein.

Respectfully submitted this 10th day of April, 2026.

/s/ Stephen Chahn Lee
Stephen Chahn Lee
Admitted *pro hac vice*
Attorney for Defendant
Law Office of Stephen Chahn Lee, LLC
209 S. LaSalle St, Suite 950
Chicago, IL 60604
312-436-1790
slee@stephenleelaw.com

24

**<u>Certificate of Conference</u>**

I, Stephen Chahn Lee, counsel for defendant Mark Loftis, certify that I conferred with counsel for the United States by sending them a draft of this motion by email on April 3, 2026.  I then had a virtual meeting with government counsel on April 7, 2026.  Counsel for the government said that they are opposed to this motion.  This motion concerns matters that are not covered in the scheduling order (Docket #16).

<u>/s/ Stephen Chahn Lee</u>
Stephen Chahn Lee
April 10, 2026