UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 6:25-cr-350-PGB-RMN

MARK LOFTIS

## **SUPPLEMENTAL MOTION IN LIMINE**

The United States, by and through undersigned counsel, respectfully files this motion in limine consistent with the leave granted by the Court at the parties' last status conference. In correspondence to the United States and at the parties' last status conference on May 26, 2026, Defendant indicated that he plans to offer evidence of: (1) advice given to him by non-attorneys, specifically a "biller," that his conduct complied with the law; (2) co-conspirators' descriptions to Defendant of purported advice the co-conspirators' attorneys provided to the co-conspirators (but not directly to Defendant); and (3) written legal opinions drafted by co-conspirators' attorneys and provided to Defendant by a co-conspirator. On June 9, 2026, Defendant filed a trial brief referencing his intent to admit correspondence with his counsel and the counsel of co-conspirators. Dkt. 62 at 21-23; Dkt. 62-5. In response to an inquiry from the Government, on June 10, 2026, counsel for Defendant Mark Loftis indicated that he will be raising an advice-of-counsel defense. For the reasons below, Defendant's advice of "biller" and reliance on the advice of co-conspirators' lawyers defenses should be excluded as based on inadmissible hearsay, violative of Rule 403, and beyond the scope of what is admissible as good faith reliance on experts.

1

Additionally, in Defendant's filings since the Government's March 16, 2026 motion in limine regarding advice of counsel, Dkt. 33, Defendant has indicated that he plans to argue, cross-examine witnesses, and/or offer evidence that: (1) Medicare failed to take action to stop fraud despite knowing about "red flags" in the durable medical equipment ("DME") and telemedicine space should the Government offer evidence of "red flags" in Defendant's billing patterns and (2) that the Government used misstatements of law to convince cooperating witnesses to wrongly plead guilty. Such argument, questioning, and evidence is without foundation, inadmissible pursuant to Rule 403, and risks evading the role of the Court to instruct the jury regarding the law.

## A. Defendant Should Not Be Permitted to Offer Legal Advice from His Deceased Non-Lawyer Co-Conspirator Couched as Reliance on an Expert.

During the May 26, 2026 status conference, Defendant's counsel indicated that he intends to assert a "good-faith reliance on a biller" defense, referring to his co-conspirator, Gregory Simms ("Simms"), who is identified as "Individual 2" in the Indictment and who passed away in the middle of the conspiracy. Simms played a key role helping to manage Defendant's DME company and initially received over 95% of its profits, but Defendant never disclosed to Medicare Simms's role as an owner or manager as required. Simms's advice to Defendant that their arrangements with the marketers (like Prizm Media ("Prizm") and others) did not violate the Anti-Kickback Statute ("AKS") should not be admitted as part of an advice of "biller" defense because it is hearsay, it falls outside the scope of a biller's expertise, there is not sufficient

foundation that Simms had the necessary expertise to render such opinions, and it is violative of Rule 403.

### a. Legal Background

A review of case law from within the Eleventh Circuit reflects that, "although good-faith reliance on the advice of a government official, attorney, or other professional about a matter within their expertise might negate specific intent," the individual being relied upon must actually have been an expert in that area. *Asadorian v. United States*, No. 3:17-cv-1241-MMH-JBT, 2021 WL 928408, at *5 (M.D. Fla. 2021) (citing *United States v. Kottwitz*, 614 F.3d 1241, 1271 (11th Cir. 2010), *opinion withdrawn in part on denial of rehearing*, 627 F.3d 1383 (11th Cir. 2010)) (concluding that the person defendant claimed to have relied upon was not an expert and therefore could not form the basis of a good faith reliance defense). Further, a good faith reliance defense requires the same type of instruction used with asserting a good faith reliance on advice-of-counsel defense; "the defendant must show that he '(1) fully disclosed all relevant facts to the expert and (2) relied in good faith on the expert's advice.'" *United States v. Maggert*, 428 F. App'x 874, 880 (11th Cir. 2011) (quoting *Kottwitz*, 614 F.3d at 1271) (affirming the denial of a good faith reliance on professional advice instruction because the defendant could not establish that he relied on the tax professionals); *United States v. Johnson*, 730 F.2d 683, 686 (11th Cir. 1984) (rejecting the need for such an instruction where the defendants' defense was that they "did not willfully and knowingly make false statements" rather than that "they relied on expert advice in making such statements").

### b. Such Evidence is Inadmissible in this Case

As a prerequisite to admitting evidence of advice given by Simms as a billing expert, Defendant first must establish that Simms actually had such expertise. If that can be established, the expertise being admitted must be limited to that within the scope of a biller's expertise. A biller's expertise, for example, might include rules regarding certain billing codes, claims processing, and billing requirements. A biller, however, is not an attorney. Legal opinions, such as what contractual arrangements violate the AKS, a criminal statute, are outside such a scope of a biller's expertise and therefore without the requisite foundation and misleading under Rule 403. Said another way, even assuming Simms was a billing expert, that in no way qualified him to be an expert opining on the legal contours of the AKS. Admitting his legal opinions would mislead and confuse the jury.

Additionally, while Defendant's counsel referred to Simms as Defendant's biller at the status conference, the communications Defendant wishes to admit describe Simms as a legal compliance expert, including as a leading expert in the country regarding legal compliance for a DME program. Even if Simms is characterized as a legal compliance expert rather than a biller, Simms does not appear to have any actual qualifications of a legal compliance expert. Indeed, the materials provided by Simms to Defendant would lead a reasonable person to question his status as an expert. For example, Simms reported to Defendant that lawyers have repeatedly and consistently disagreed with Simms's advice. For example, the "Legal Compliance" document Simms provided to Loftis, attached as Exhibit 3 to Defendant's trial brief, Dkt. 62-3,

4

included a statement addressing "Why is everyone telling me [Simms's DME Program] is illegal?" and a statement addressing "Is it worth the risk?" In another email, attached as Exhibit 2 to Defendant's trial brief, Dkt. 62-2, Simms admits that, other than an unnamed "top law firm in Healthcare," "every lawyer in the last 20 years has said my program is illegal." Allowing Defendant to present purported expert legal opinions by a non-lawyer without actual expertise in the legal compliance would confuse and mislead the jury. Such opinions are inadmissible pursuant to Rule 403.

Finally, whether rendering the opinions as a purported biller or legal compliance expert, Simms's opinions are inadmissible hearsay as Simms's emails are out-of-court statements being offered for the truth of the matter asserted. To the extent they are being offered for the effect on the listener, any probative value is substantially outweighed by the risk they will mislead or confuse the jury because of his lack of legal background.[1] Therefore, his statements of the law should be excluded.

**B. Defendant Should Not Be Permitted to Offer Through Hearsay Testimony the of Attorneys Representing Third Parties Persons.**

Defendant also indicated at the May 26, 2026 hearing and in correspondence with the Government that he intends to offer evidence of advice purportedly provided to his co-conspirators by their attorneys and then shared by those co-conspirators with Defendant. Specifically, Defendant plans to introduce emails attaching an opinion by an attorney for one of the DME marketers approving of certain business practices;

---

[1] To the extent such an opinion is a misstatement of the law, the risk pursuant to Rule 403 is even greater. The jury hearing a hearsay or hearsay-within-hearsay statement that is incorrect about the law will both confuse and mislead them.

purported advice given by unidentified attorneys for one of the telemedicine companies from whom Defendant obtained signed doctors' orders; and purported advice given by unidentified attorneys to co-conspirator Simms. This advice and purported advice provided by co-conspirators' counsel should not be admitted as it is often irrelevant, inadmissible hearsay or hearsay-within-hearsay if not admitted through the testimony of the attorneys themselves, and violative of Rule 403 as it cannot be examined at trial to determine its veracity and reliability.

### a. Legal Background

The case law addressing the admission of such third party or "derivative" advice of counsel evidence appears sparse, but courts who have addressed the issue have recognized that a defense based on such advice is not part of the traditional advice-of-counsel defense. In *United States v. Romero*, 542 F. App'x 879 (11th Cir. 2013), the Eleventh Circuit rejected a defendant's argument that the district court should have treated such a defense the same as an advice-of-counsel defense. The Eleventh Circuit found that the district court did not abuse its discretion in refusing to give the requested jury instruction on good-faith reliance on the advice of counsel based on defendant's alleged reliance on "a third party's consultation with counsel." *Id.* at 883. The Eleventh Circuit noted that there was no reversible error because, "it [wa]s also unclear from the evidence in the record whether [the third party who consulted counsel] fully disclosed all material facts to his attorney about the course of conduct that he elected to follow . . . .," and the district court's general good-faith instruction substantially covered the defendant's argument. *Id.*; *see also United States v. Hagen*, 542 F. Supp. 3d

6

515, 517 (N.D. Tex. 2021) (holding that a derivative advice of counsel defense was not an advice of counsel defense).

The Government has not found a decision in this Circuit squarely embracing reliance on third-party's advice of counsel as a good faith defense. *Romero* does not address whether reliance on third-party advice of counsel is a viable good faith defense but rather affirmed a conviction where the district court otherwise gave a good faith instruction. Although a similar issue arose in a case in the Middle District of Florida, where the defendant, who did not have his own counsel, sought to introduce evidence that a co-defendant met with an attorney to "show that [the defendant] believed the [co-defendant] to be acting in good faith," the district court decided to "determine whether a general good faith instruction is appropriate after hearing the evidence produced at trial and the parties' deliberations at the charge conferences" and declined to make a determination at that time if such evidence was admissible pursuant to Rule 401 and 403 pre-trial.[2] *United States v. Alston*, No. 5:23-cr-00039-GAP-PRL, Dkt. 177 at 2–4, 6 & n.1 (M.D. Fla. Mar. 21, 2025).

Outside of the Eleventh Circuit, the Fifth Circuit held that it was not plain error for a district court to preclude the defendant from raising through the questioning of that co-conspirator a "'variant of a good-faith defense'" premised on a co-conspirator seeking the advice of counsel. *United States v. Rao*, 123 F.4th 270, 281 (5th Cir. 2024) (limiting the holding in *Hagen*). *Rao*, like *Hagen*, noted the novelty of such a defense.

---

[2] The defendant pleaded guilty, and the trial did not occur.

*Id.*; *Hagen*, 542 F. Supp. 3d at 517. A district court in the Southern District of Florida excluded the admission of derivative advice of counsel evidence to support a generalized good faith defense where the advice that the counsel purportedly provided, "assuming it would not be inadmissible hearsay, would not be probative to negate an intent to defraud and would confuse and distract the jury with irrelevant evidence" because the advice provided by the third party's counsel did not address the specific conduct the government alleged was illegal. *United States v. Hampton*, No. 23-CR-20172-KMW-2, 2024 WL 81227, at \*4–5 (S.D. Fla. Jan. 6, 2024).

### b. Defendant's Evidence Regarding Co-conspirators' Lawyers is Inadmissible

A review of some of the documents that Defendant has represented in correspondence to the Government and his trial brief, Dkt. 62 at 22; Dkt. 62-1; Dkt. 62-4, that he plans to admit under this theory is illustrative. First, Defendant has indicated that he intends to admit two letters drafted by attorneys that were provided to Defendant by individuals at Prizm, a marketing company from whom Defendant is alleged to have purchased doctors' orders. Dkt. 62-1; Dkt. 62-4 at 7. The first letter, Dkt. 62-1, which was not specific to Prizm's relationship with Defendant, asserted that Prizm's services were lawful because Prizm was not seeking reimbursement based on the volume or value of the "qualified leads" but on an hourly basis for the work Prizm did, with highlighting added:

As a lead generation company, Prizm Media prefers to collect raw/unqualified leads, as its strength is in generating customer interest for its healthcare clients. As part of the process of collecting raw/unqualified leads, Prizm Media collects only customer name, address, and contact information for purposes of obtaining prior express written consent for a follow-up call. Prizm Media is paid on a cost per inquiry basis for raw/unqualified leads. To the extent Prizm Media generates "qualified leads," it does so by engaging in a yearly agreement and billing on an hourly basis as a media agency at a rate of $125 per hour **or** billing on a fixed budget per month for an entire year. Prizm Media provides the following services for purposes of generating qualified leads: media buying, hiring, training, campaign coordination, call center operations, and business process outsourcing. In its Master Service Agreements ("MSA") with its clients, Prizm Media includes a "Statement of Work" ("SOW") that sets forth the fixed-fee compensation model described above.

The second letter, Dkt. 62-4 at 7, repeats much of the same, focusing on a contract for the generation of qualified and raw/unqualified leads on a fixed, flat-fee basis.

However, this is not the conduct that the Government alleges that Defendant engaged in with Prizm. Defendant is accused of paying for doctors' orders based on the volume and value of those orders—not of purchasing raw/qualified leads on a fixed, flat-fee basis or paying for qualified leads based on an hourly services rate. Whether raw leads can be purchased at a price per lead or qualified leads can be sold at an hourly service rate is not at issue. The dispute will be regarding Prizm's sale of doctors' orders to Defendant which were (1) hidden by the use of sham contracts that appeared compliant on their face but did not reflect the business actually being conducted and (2) billed to federal government health care programs. Accordingly, the only relevant advice would be whether buying doctors' orders from Prizm to be billed to federal government health care programs was legal. The letters from Prizm's attorneys setting out that buying raw leads or paying for qualified leads is compliant does not go to the issue in the case—whether purchasing doctors' orders from Prizm was legal. Their advice, like in *Hampton*, addresses issues not in dispute and, like the

advice in *Hampton*, should be excluded as irrelevant.

As a general matter, to the extent that third-parties' attorneys rendered opinions about arrangements other than those that Defendant is charged with undertaking or aspects of the business that are not at issue, their advice does not address the conduct the Government alleges was illegal. *See Hampton*, 2024 WL 81227, at *4–5. For example, the purchase and sale of raw or qualified leads rather than doctors' orders is not at issue. Similarly, whether rules like opt-in call center regulations were followed are not at issue. *See* Dkt. 62 at 18. This case is not about whether call centers followed proper opt-in procedures. Such legal opinions are not relevant and would confuse and mislead the jury. In addition, advice that co-conspirators were acting compliantly in business that did not involve Defendant or had paid money to lawyers previously (for unidentified services) is irrelevant and would mislead the jury into thinking that because the third parties had spent money on attorneys or had other business arrangements blessed, Defendant's relationship with that co-conspirator also must have been legal.

Further, if Defendant is permitted to admit these Prizm documents without calling the drafting attorneys, the jury would hear legal advice without an examination of the attorneys who provided the advice to establish the context of their legal opinions, including whether their opinions were based on the disclosure of accurate and complete facts. Without the opportunity to explore the basis for the attorneys' opinions, the jury will not be able to evaluate to what extent, if at all, the lawyers were aware of Prizm's actual business relationship with Defendant, on what facts the

lawyers based their opinions, and whether their advice was actually followed in practice.

Defendant also informed the Government that he intends to admit legal advice given to him through Art Geiss ("Geiss"), an owner of MedTech, one of the telemedicine companies from whom Defendant is alleged to have purchased consults used to obtain signed doctors' orders for DME. Defendant indicated that he intends to admit, through his own testimony and email communications, evidence that Geiss told Defendant that Medtech's operation was compliant with the AKS, as vetted by Medtech's lawyers. He cites two email exchanges, attached as Exhibits A and B, to support this contention. In the first exchange, Exhibit A, Defendant referenced seven unnamed health care attorneys that Defendant claimed Geiss purportedly previously referenced. Geiss responded with his own opinion but warned that he is not a lawyer. Geiss also wrote that he thought his attorneys would be unwilling to give Defendant advice but offered to run Defendant's email past his counsel. Geiss then directed Defendant to make his own decision about how to proceed. In the second exchange, Exhibit B, Defendant and Geiss are discussing money that Geiss is owned by Defendant. Defendant suggests that his and Geiss's attorney get on the phone and then requests that Geiss get an opinion letter from the law firm purportedly representing Geiss, "RezLegal." There is no mention of what advice Geiss's purported lawyers may have provided.

Exhibits A and B are hearsay, contain inadmissible hearsay within hearsay, and are inadmissible pursuant to Rule 403. Both emails contain self-serving statements by

11

Defendant; indeed, Exhibit B does not even contain advice from Geiss's purported counsel and therefore cannot be relevant to a derivative advice of counsel defense. With regards to Rule 403, Defendant's restatement of Geiss's purported claim to have multiple counsel (which is not confirmed by Geiss) and the references to Geiss's counsel are substantially more prejudicial than probative. There is no indication who Medtech's attorneys were, whether the attorneys even existed, what they were told (if anything), upon what topics they opined (if any), or what their advice actually was (if any). The statements in the email would mislead the jury into believing that those attorneys were given complete facts about Defendant's relationship with Medtech and Medtech's operation, rendered an opinion on the legal issues in this case, and Medtech followed that advice. No foundation for such assumptions exists. The emails also contravene Rule 403 because they contain Defendant or Geiss providing their own opinions on the law without an expertise to do so. These emails are a vehicle to try to get in self-serving hearsay rather than meaningful evidence of advice from counsel. Such opinions would confuse and mislead the jury.

A third source of derivative advice of counsel identified by Defendant comes from Simms. Simms made statements to Defendant regarding purported legal advice that Simms received from unidentified attorneys and at unclear times. Again, there is no evidence that Simms actually received any such legal advice. For example, one of the email exchanges that Defendant proposes to admit is attached as Exhibit C. Here, in an email to Simms, Defendant included a link to an article by a lawyer setting out the illegalities of the arrangements at issue and describing recent law enforcement

actions. Simms's responded that "while every lawyer in the last 20 years has said my program is illegal," he had the approval of "a top law firm in Healthcare." The full exchange includes both double hearsay—Simms's claim that a top law firm blessed his "program"—and Defendant's self-serving hearsay that he believed the advice of lawyers were merely "scare tactics." And again, there is no way to discern the identity of Simms's unidentified lawyers, whether the lawyers actually existed, whether the advice was actually given, what the purported advice was, what information was given to the purported lawyers that served as the basis for any advice, or whether Simms actually followed the advice.

Accordingly, the Court should exclude this evidence as irrelevant, as inadmissible hearsay, and violative of Rule 403.[3]

### c. The Email Exchanges are Not Admissible as Business Records or for the Effect on the Listener

In his trial brief, Defendant cites *United States v. Brown*, 125 F.4th 1043 (11th Cir. 2025), for the proposition that "emails can be admitted as business records under the hearsay exception provided in Rule 803(6) if a witness lays the proper foundation." Dkt. 62 at 7. The emails containing purported derivative advice of counsel are not admissible as business records pursuant to Rule 803(6), and *Brown* does not stand for

---

[3] Should the Court decline to exclude this evidence pre-trial, the Government, as in *Hagen*, respectfully asks that the Court order full disclosure of the advice given to Defendant by his own lawyers on the same topics as any advice purportedly provided by third parties' attorneys—to the extent those disclosures are not already being made as part of Defendant raising the advice-of-counsel defense per the Court's order, Dkt. 33. Such disclosures are necessary for the Government to evaluate and rebut this derivative advice-of-counsel evidence.

that proposition. The Eleventh Circuit in *Brown* concluded that data logs and information lists from the phone fell with Rule 803(6)—extraction reports from a cell phone, records of phone numbers and emails for the phone, call logs, and location data were all business records. *Id.* at 1055. It admitted the actual text messages for other reasons, not as business records. *Id.* at 1055–56. Courts have repeatedly held that an email is not a business record simply because a business sends emails and the emails are stored in a business's system. *Westgate Resorts, Ltd. v. Reed Hein & Assocs., LLC*, No. 6:18-CV-1088-GAP-DCI, 2021 WL 4428800, at *3 (M.D. Fla. June 24, 2021) (citations omitted); *United States v. Kachkar*, No. 16-20595-CR, 2020 WL 7021590, at *7 (S.D. Fla. Nov. 30, 2020) (citation omitted); *Candy Craft Creations, LLC v. Gartner*, No. 2:12-CV-91, 2015 WL 6680883, at *2 (S.D. Ga. Nov. 2, 2015) (citations omitted); *see also Rhodes v. Arc of Madison Cnty., Inc.*, 920 F. Supp. 2d 1202, 1229 (N.D. Ala. 2013) (resignation email not a business record). As one district court in this Circuit explained:

> An email is one example of a document commonly produced in the business environment that may or may not be admissible under the exception. Email is simply a medium for written communication, to be treated like any more-traditional form of written communication. Indeed, because of its informality and speed, email is something of a hybrid between traditional written correspondence and oral communication, and it therefore requires scrutiny before being considered a record of regularly conducted activity.

*LeBlanc v. Nortel Networks Corp.*, No. 3:03-CV-65 (CAR), 2006 WL 8445961, at *4

(M.D. Ga. June 30, 2006); *see also In re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico, on Apr. 20, 2010*, No. MDL 2179, 2012 WL 85447, at *3 (E.D. La. Jan. 11, 2012) ("As to the argument that the defendants regularly receive electronic mail as part of daily business activities and that their regular practice is to receive and retain such emails, if this was sufficient to invoke the business records exception, then all physical mail received by a defendant likewise would be a 'business record.' This cannot be the right result."). Each of the requirements of Rule 803(6) must be met for a document to be admissible pursuant to Rule 803(6). *United States v. Bueno-Sierra*, 99 F.3d 375, 378–79 (11th Cir. 1996) (citation omitted). "The touchstone of admissibility under the business records exception to the hearsay rule is reliability, and a trial judge has broad discretion to determine the admissibility of such evidence." *Id.*

Here, the emails containing what a co-conspirator claims his or her attorney said are not regular business activities and lack sufficient assurances of reliability. Although the format of the email itself may be a business record, the content of the email is unique. The emails are not rote business activities conducted on a routine basis that, as a result of their regular nature, have inherent reliability. They are often self-serving communications and contain multiple levels of hearsay. Without the actual attorney who made the purported statement testifying, the jury cannot meaningfully evaluate and the Government cannot challenge whether such a statement was actually made, the factual basis upon which it was made, and the accuracy of any such statement. In cases where the identity of the attorney is unknown, the jury also cannot evaluate and the Government cannot challenge the credibility of

the person making the statement.

Nor can the multiple levels of hearsay be overcome by arguing that the statements are not being offered for the truth of the matter asserted. A reflexive argument that a statement by a third party's attorney, whether directly or via the third party, is admitted not for the truth of the matter asserted but its effect on the listener ignores the critical questions of what the actual advice was and, consequently, whether it was reasonable for Defendant to rely on the derivative legal opinion. The reason statements offered for the effect on the listener are not hearsay is that regardless of truth of the statement, the jury can assume the listener was informed and affected by the statement and may have acted accordingly. But if the co-conspirator provided incomplete or misleading facts to his or her lawyer for the purpose of obtaining certain legal advice in furtherance of the conspiracy (for example, to obtain sham contracts), the conspirators cannot then claim they were informed and affected by the advice when they engineered a legal opinion inconsistent with the reality of their arrangement. Listeners do not get to introduce legal opinions the they know did not reflect the reality of the business practices and are not fully informed and then claim that they were affected by such opinions.

## C. Defendant Should be Precluded from Blaming the Alleged Victim Federal Agencies.

In his motion in limine regarding the Government's expert disclosures, Dkt. 31, Defendant asserts that if the Government is permitted to offer evidence of "billing patterns that they believe are 'red flags' or signs of fraud, waste or abuse," he intends

to offer evidence "showing that Medicare did not respond to such 'red flags' when it was well aware by 2018 about problems with DME and telemedicine." *Id.* at 14. The Government moves *in limine* to preclude Defendant from arguing, offering evidence, or eliciting on direct or cross-examination any "blame the victim" defenses, including, but not limited to, argument or evidence that Defendant should not be convicted of defrauding Medicare, TRICARE, or CHAMPVA because those programs paid the claims submitted through Defendant's DME company. Similarly, the Government moves *in limine* to prevent Defendant from arguing that Medicare, TRICARE, and/or CHAMPVA somehow approved Defendant's conduct by reimbursing for DME, permitting telemedicine, and paying the claims at issue here. Such evidence is irrelevant, improperly blames victims of the fraud, and would mislead the jury in contravention of Rule 403.

As Defendant concedes, "the government's failure to detect and prevent fraud, waste and abuse is generally not relevant in a criminal case, . . . ." *Id.* It is well-established that the negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct. "A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence." *United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009). [4] This concept holds true throughout criminal law. Bank robbers are not absolved of their crimes if the bank security systems are deficient; home

---

[4] *See also United States v. Coyle*, 63 F.3d 1239, 1244 (3rd Cir. 1995) (negligence of victim in failing to discover fraud scheme is not a defense to criminal conduct); *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007) ("[A] victim's lack of sophistication is not relevant to the intent element of mail or wire fraud.") (collecting cases).

invaders are not absolved if homeowners leave a key under the mat; and individuals who perpetrate Ponzi schemes are not innocent if their clients include sophisticated Wall Street brokers. There is no contributory negligence in criminal law.

Defendant cannot point his finger at Medicare, TRICARE, or CHAMPVA—the victims in this case—to excuse his own conduct. As the Eleventh Circuit, sitting *en banc*, explained:

> Because the focus of [a fraud] statute, like any other criminal statute, is on the violator, . . . a defendant who intends to deceive the ignorant or gullible by preying on their infirmities is no less guilty. . . . whatever role, if any, a victim's negligence plays as a bar to civil recovery, it makes little sense as a defense under a criminal statute that embraces "any scheme or artifice to defraud." A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence.

*Svete*, 556 F.3d at 1165 (internal citations omitted). Following the Eleventh Circuit in *Svete* and various other Circuit courts,[5] this Court should exclude any discussion of Medicare's, TRICARE's, or CHAMPVA's purported negligence. Even if Medicare, TRICARE, or CHAMPVA could have done more to stop the fraud or was at fault—which they were not—such evidence would still be irrelevant, improper, and no defense to the charged scheme.

---

[5] *See United States v. Davis*, 226 F.3d 346, 358–59 (5th Cir. 2000) (affirming jury instruction that "the naivety, carelessness, negligence, or stupidity of a victim does not excuse criminal conduct, if any, on the part of a defendant"); *Amico*, 486 F.3d at 780; *see also United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000) ("If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts." (quoting *United States v. Brien*, 617 F.2d 299, 311 (1st Cir. 1980)).

In addition to being irrelevant, evidence concerning Medicare's, TRICARE's, or CHAMPVA's conduct would be unduly prejudicial under Rule 403. Allowing Defendant to argue that Medicare, TRICARE, and/or CHAMPVA was negligent in paying the claims at issue—and that this somehow excuses Defendant's criminal conduct—would mislead the jury. Allowing evidence or argument about such conduct to come before the jury could create the erroneous impression that, in order to find Defendant guilty, the jury must find that Medicare, TRICARE, or CHAMPVA could or should not have discovered Defendant's misconduct. Because that is misleading and an incorrect statement of the law, Defendant should not be allowed to create such improper impressions. Thus, the Court should preclude Defendant from introducing any such "blame the victim" defense. Defendant should not be permitted to argue that anyone *should* or *could* have discovered their fraud sooner and denied the claims or that Medicare, TRICARE, and/or CHAMPVA somehow blessed Defendant's conduct by issuing a provider enrollment number or paying claims. *E.g. United States v. Young*, No. 19-cr-60157, D.E. 96 (S.D. Fla. Dec. 4, 2019) (noting that "evidence suggesting that the [government programs at issue] were negligent in paying claims connected with the alleged kickback conspiracy, or failed to adequately prevent fraud, is not admissible"); *United States v. Agresti*, No. 18-cr-80124, D.E. 350 (S.D. Fla. Jan. 18, 2022) (paperless order granting in part Government's motion *in limine* to exclude "blame the victim" defenses in addiction treatment fraud case charging scheme to fraudulently bill excessive and medically unnecessary urinalyses).

**D. Defendant Should Not Be Permitted to Question Witnesses Whether, or Make Arguments to the Jury that, the Government Improperly Misstated the Law.**

In Defendant's motion in limine regarding the AKS, Dkt. 48, Defendant suggested that the Government may have influenced cooperating witnesses by misstating the law and presented "improper testimony and argument from the government concerning AKS theories" before the grand jury *Id.* at 1, 15-16, 18, 20. Such suggestions are without foundation and would be unduly prejudicial in contravention of Rule 403. The cooperating witnesses were prosecuted by multiple different prosecution teams in different districts, represented by able counsel, and had their pleas accepted by multiple different district courts. Because even the suggestion of such accusations are extremely prejudicial and cannot be unrung once made before the jury, Defendant should be required to first raise the specifics of this issue outside the presence of the jury before any arguments or questioning on this issue in order to establish a factual sufficiently probative basis for such questioning, argument, testimony, or other evidence and to permit the Court to evaluate admissibility pursuant to Rule 403.

Further, in order to question witnesses about alleged misstatements of the law, Defendant would need to identify to the jury what he believes to be the incorrect statements of the law made by the Government and what he believes the purported correct interpretation of the law is. Doing so would inevitably require Defendant's counsel to opine on what the law is and is not. That is a role reserved for the Court and would confuse and potentially mislead the jury, in contravention of Rule 403.

20

Such lines of cross examination and argument should be excluded unless the Court first makes a determination outside the present of the jury that it is admissible.

### E. Conclusion

For the reasons set for above, the Government respectfully asks that the Court grant the Government's supplemental motion in limine.

<div style="margin-left: 45%;">

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

LORINDA LARYEA
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By:    */s/ Catherine Wagner*
Catherine Wagner
Acting Assistant Chief
Florida Special Bar No. A5502410
Raymond E. Beckering III
Trial Attorney
Florida Special Bar No. A5503174
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Ave NW
Washington, DC 20005
Phone: (202) 794-0097
catherine.wagner@usdoj.gov
Phone: (202) 262-8176
raymond.beckering.iii@usdoj.gov

</div>

## CERTIFICATE OF CONFERENCE

I hereby certify that on June 13 and 14, 2026, I conferred with counsel for

Defendant, whose position is as follows:

Defendant Mark Loftis has not reviewed the government's motion regarding Greg Simms and Prizm's lawyers but opposes an attempt to preclude "hearsay within hearsay" as moot because he is not attempting to elicit statements by Simms or Prizm's lawyers about the Anti-Kickback Statute or their compliance with the law for the truth of the matters asserted. In fact, defendant believes that Simms and Prizm's lawyers made some inaccurate statements regarding the Anti-Kickback Statute and would ask the Court to instruct the jury about such inaccuracies when the statements are presented. Defendant also opposes an attempt by the government to preclude Simms's statements for being outside his expertise because he is not seeking to admit Simms's statements to him as expert evidence. Defendant further objects to an attempt by the government to bar relevant evidence that is critical to his defense. As noted in the trial brief (Docket 62), defendant has already said that he would agree to a modified form of the advice of counsel instruction to reflect billers and other professionals and has already provided voluminous disclosures regarding such people. Defendant also notes that the Government has been aware of the statements by Mr. Simms and Prizm's lawyers for years so cannot claim prejudice, and defendant also notes that the Government could have filed a motion regarding Mr. Simms and Prizm's lawyers months ago at the same time that the government filed its motion regarding Mr. Loftis's attorneys.

Defendant Mark Loftis does not plan to assert "blame the victim" defenses but objects to the extent that this motion would preclude Mr. Loftis from explaining his state of mind at relevant times and reserves the right to revisit this if the government opens the door through its presentation at trial.

Defendant does not intend to cross-examine witnesses regarding whether the government misrepresented the law in order to induce the witnesses' guilty pleas unless the

government    asks    witnesses    about    their *current* understanding of the AKS and the law at the time of trial.

By:    */s/ Catherine Wagner*
Catherine Wagner
Acting Assistant Chief

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel for Defendant.

By:    */s/ Catherine Wagner*
Catherine Wagner
Acting Assistant Chief