UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

CASE NO.

v.

MARK LOFTIS

18 U.S.C. § 1349
(Conspiracy to Commit
Health Care Fraud and
Wire Fraud)

## INDICTMENT

The Grand Jury charges:

### A.    General Allegations

At all times material to this Indictment:

*The Defendant and Relevant Entities*

1.      The defendant, Mark Loftis, resided in the Northern District of Oklahoma.

2.      Orthosis and durable medical equipment (collectively, "DME") were reusable medical equipment such as orthotic devices, meaning knee braces, back braces, shoulder braces, wrist braces, and other braces (collectively "braces"), and continuous glucose monitors and other diabetic supplies.

3.      Back Pain Home Supplies LLC dba EZ Medical Supply ("Back Pain") was a DME company located in the Northern District of Oklahoma. Mark Loftis was the owner and registered agent of Back Pain and a signatory on a bank account at RCB Bank ending in 5896 ("RCB Account 1") and a bank account at RCB Bank ending in 6904 ("RCB Account 2").

1

4. Loftis Medical LLC ("Loftis Medical") was an Oklahoma limited liability company that listed Individual 1 as the sole owner.

5. LJM Health Group LLC ("LJM") was an Oklahoma limited liability company. Mark Loftis was the owner and registered agent of LJM.

6. Company 1 was a medical supply company located in the Middle District of Florida.

7. Individual 2 was a resident of Illinois, who founded, owned, and operated Company 2, a company located in Illinois.

*The Medicare Program*

8. The Medicare Program ("Medicare") was a federal health care benefit program that provided benefits to individuals who were (a) age 65 or older, (b) had certain disabilities, or (c) had end-stage renal disease. Individuals who received Medicare benefits were called "beneficiaries."

9. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), which was an agency of the United States Department of Health and Human Services ("HHS").

10. Medicare was a "health care benefit program" as defined in Title 18, United States Code, Section 24(b), and a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f).

11. Medicare was made up of several component "parts" that covered different items and services. Medicare Part A covered hospital services. Medicare Part B covered, among other items and services, outpatient care and supplies,

including DME. Medicare Part C, also known as Medicare Advantage, was a program under which Medicare benefits were delivered through private insurance companies. Medicare Part D provided prescription drug coverage.

12.    Under Medicare Part B, beneficiaries could receive Medicare-covered DME from "suppliers" that were enrolled in Medicare.

13.    To help administer Medicare, CMS contracted with private companies called "Medicare Administrative Contractors" or "MACs." MACs performed many functions, such as enrolling DME suppliers into Medicare and processing Medicare claims. In performing such functions, MACs were assigned to particular geographic "jurisdictions." For DME claims, they were called Jurisdictions A, B, C, and D.

*Medicare Part B Enrollment and DME Claims Submitted under Medicare*

14.    DME companies, physicians, and other health care providers that provided items and services to Medicare beneficiaries were referred to as Medicare providers. To participate in Medicare, providers were required to submit an enrollment application designated as CMS Form 855.

15.    On the CMS Form 855, an applicant was required, among other things, to provide complete and accurate information, with any changes reported within 30 days. The applicant also was required to disclose all persons and organizations with an ownership interest, which was defined as owning 5% or more, and all managing employees, which was defined as an individual who exercises operational or managerial control over or directly or indirectly conducts day-to-day operations of the company, either under contract or through some other

3

arrangement, whether or not the individual is a W-2 employee of the company.

16.     CMS Form 855 also required the applicant to certify that it would (a) abide by applicable Medicare laws, regulations, and program instructions, and (b) refrain from knowingly presenting or causing to be presented a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity. Medicare providers were given access to Medicare manuals and service bulletins describing billing procedures, rules, and regulations.

17.     If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A health care provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for medically necessary items and services rendered to beneficiaries.

18.     A claim for DME reimbursement was required to set forth, among other information, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and unique provider identification number of the licensed provider who prescribed or ordered the DME. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company.

19.     To be reimbursable, Medicare required that all medical items and services be reasonable and medically necessary for the treatment or diagnosis of the patient's illness or injury, ordered by a licensed medical professional, properly documented, and provided to the beneficiary as represented to Medicare. Medicare

4

would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

*The TRICARE Program*

20.    TRICARE was a health care program of the United States Department of Defense ("DOD"), Military Health System, that covered, among other individuals, active-duty service members, retired service members, and their families. Individuals who received health care benefits through TRICARE were generally referred to as "beneficiaries."

21.    TRICARE was a "health care benefit program" as defined in Title 18, United States Code, Section 24(b), and a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f).

22.    The Defense Health Agency ("DHA"), an agency of the DOD, was the military entity that oversaw and administered the TRICARE program.

23.    TRICARE paid for certain medical items and services, including DME, on behalf of beneficiaries.

24.    TRICARE reimbursed providers for items and services provided to TRICARE beneficiaries that were deemed to be medically necessary.

*CHAMPVA*

25.    The Civilian Health and Medical Program of the Department of Veterans ("VA") Affairs ("CHAMPVA") was a federal health benefit program. CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries.

26. CHAMPVA beneficiaries included the spouses and children of veterans who had been rated permanently and totally disabled for a service-connected disability and the surviving spouses and children of veterans who had died from VA-rated service-connected disabilities. In general, the CHAMPVA program covered most health care services and supplies that were medically necessary.

27. CHAMPVA was the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover. Health care claims must have first been sent to Medicare for processing. Medicare electronically forwarded claims to CHAMPVA after Medicare had processed them. For Medicare supplemental plans, CHAMPVA processed the remaining portion of the claim after receiving Medicare's explanation of benefits.

28. CHAMPVA was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program" as defined by Title 42, United States Code, Section 1320a-7b(f).

## COUNT ONE
### (Conspiracy to Commit Health Care Fraud and Wire Fraud)

29. The allegations contained in Paragraphs 1 through 28 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

30. From in or around September 2017, and continuing through in or around October 2020, in the Middle District of Florida and elsewhere, the defendant,

MARK LOFTIS,

6

did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the grand jury, to commit health care fraud, in violation of 18 U.S.C. § 1347, and wire fraud, in violation of 18 U.S.C. § 1343.

### A.    Purpose of the Conspiracy

31.    It was a purpose of the conspiracy for Mark Loftis and others to unlawfully enrich themselves by, among other things: (a) offering, paying, soliciting, and receiving illegal kickbacks and bribes in exchange for the referral of Medicare beneficiaries and doctors' orders for braces and other DME; (b) offering, paying, soliciting, and receiving illegal kickbacks and bribes in exchange for the referral of medical providers' signatures on doctors' orders for braces; (c) submitting and causing the submission of false and fraudulent claims to Medicare, TRICARE, and CHAMPVA for braces and other DME that were ineligible for reimbursement, medically unnecessary, and procured through the payment of illegal kickbacks and bribes; (d) concealing and causing the concealment of kickbacks and bribes and false and fraudulent claims; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### B. Manner and Means of the Conspiracy

32.    The manner and means by which the defendant and his co-conspirators sought to accomplish the purposes of the conspiracy included, among others, the following:

a.    It was a part of the conspiracy that Mark Loftis would and did submit and caused to be submitted to Medicare Forms CMS-855 falsely representing

to Medicare that Mark Loftis was the sole owner and had sole managing control of Back Pain. In reality, Individual 2, via Company 2, was a managing employee as defined by the Form CMS-855.

b.    It was further a part of the conspiracy that Mark Loftis would and did cause CMS Forms to be submitted to Medicare in which Mark Loftis certified to Medicare that Back Pain would comply with all Medicare rules and regulations, including that it would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare.

c.    It was further a part of the conspiracy that marketers would and did cause Medicare beneficiaries to be recruited using telemarketing and to be referred to Back Pain.

d.    It was further a part of the conspiracy that Mark Loftis would and did pay illegal kickbacks and bribes to co-conspirator marketers in exchange for doctors' orders for braces and other DME.

e.    It was further a part of the conspiracy that Mark Loftis would and did pay illegal kickbacks and bribes to co-conspirators in exchange for the co-conspirators arranging for medical providers to engage in purported telehealth consultations and sign orders for braces, even though the medical providers did not have a pre-existing relationship with the beneficiaries, did not examine the beneficiaries, and only had a telephonic conversation with the beneficiaries, if any contact.

f.      It was further a part of the conspiracy that Mark Loftis and others would and did cause the submission of false and fraudulent claims to Medicare for braces and other DME that were medically unnecessary, ineligible for reimbursement, and not provided as represented.

g.      It was further a part of the conspiracy that, from in or around September 2017 through in or around October 2020, Mark Loftis and others submitted and caused the submission via interstate wire on behalf of Back Pain of approximately $29 million n false and fraudulent claims to Medicare, approximately $750,000 in false and fraudulent claims to TRICARE, and approximately $90,000 in false and fraudulent claims to CHAMPVA. Medicare paid via interstate wire approximately $8 million, TRICARE paid via interstate wire approximately $63,000, and CHAMPVA paid via interstate wire approximately $8,000 on those false and fraudulent claims.

h.      It was further a part of the conspiracy that the conspirators would and did perform acts, and make statements, to promote and achieve the scheme and artifice and to misrepresent, hide, and conceal, and cause to be misrepresented, hidden, and concealed, the purpose of the scheme and artifice and the acts committed in furtherance thereof.

All in violation of 18 U.S.C. § 1349.

9