**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA**

**v.** **CASE NO. 6:25-cr-350-PGB-RMN**

**MARK LOFTIS**

**UNITED STATES' OPPOSITION TO DEFENDANT MARK LOFTIS'S FED. R. CRIM. P. 29(c) MOTION FOR JUDGMENT OF ACQUITTAL**

The United States respectfully submits this opposition to Defendant Mark Loftis's Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29(c). Dkt. 138. Because the Government presented sufficient evidence to allow a reasonable jury to find Defendant guilty, his motion should be denied.

## I. PROCEDURAL HISTORY

On July 6, 2026, Defendant proceeded to trial on one count of conspiracy to commit health care and wire fraud. Dkt. 90. The Government called sixteen witnesses and admitted over 540 exhibits. Dkt. 133. On July 21, 2026, the jury returned a guilty verdict. Dkt. 131. At trial, the evidence proved that Defendant, an owner of Back Pain Home Supplies LLC dba EZ Medical Supply ("Back Pain"), conspired with others to commit health care and wire fraud by submitting through Back Pain false and fraudulent claims to Medicare and causing claims to be submitted to TRICARE and CHAMPVA for orthotic braces, continuous glucose monitors ("CGM"), and other

durable medical equipment ("DME").[1] The evidence established that Defendant and his coconspirators perpetrated the conspiracy by: (1) hiding from Medicare the role of Greg Simms and DME Advanta and falsely certifying that only Defendant owned and was a managing employee of Back Pain; (2) permitting other entities to use Back Pain to bill Medicare, despite certifying that he would not do so; (3) submitting or causing the submission of medically unnecessary claims to Medicare, TRICARE, and CHAMPVA, despite certifying that he would not submit false claims to Medicare; and (4) paying illegal kickbacks and bribes to obtain patients, doctors' orders, and doctors' signatures on orders, despite certifying to Medicare that he would not do so. Throughout the conspiracy, Defendant and his conspirators used wires, including wire payments, emails, faxes, TV and internet advertisements, voicemails, and DropBox.

## II. LEGAL STANDARD

In determining the sufficiency of the evidence under Rule 29(c), this Court "must view all of the evidence in the light most favorable to the government," making all reasonable inferences and credibility choices in the Government's favor, and then "determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Miranda*, 425 F.3d 953, 959 (11th Cir. 2005) (citation omitted). "The jury has exclusive province over the credibility of witnesses, and [the court] may not revisit the question." *United States v. Clay*, 832 F.3d 1259, 1294 (11th Cir. 2016) (citation omitted). It is axiomatic that a jury is free to choose between

[1] The additional DME included related items, like brace sleeves and heel cups. *See* GX 102.

or among the reasonable conclusions to be drawn from the evidence presented at trial. *United States v. Almanzar*, 634 F.3d 1214, 1221–22 (11th Cir. 2011). The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion but guilt. *Garcia*, 447 F.3d at 1334. The Supreme Court has expressly rejected the theory that the prosecution "(must) rule out every hypothesis except that of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 326 (1979). "A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." *United States v. Tate*, 586 F.3d 936, 944 (11th Cir. 2009) (citation omitted).

## III. ARGUMENT

### A. The Evidence was Sufficient to Prove Criminal Intent

There was more than sufficient evidence offered at trial for a reasonable jury to conclude that Defendant acted knowingly and willfully. The emails and multiple witnesses' testimony, including Defendant's, made clear that he knew he was paying for referrals. *E.g.*, Dkt. 110 at 135:7-24; Dkt. 115 at 88:8–89:9. Correspondence repeatedly referred to a price per doctor's order, not for running advertisements or call center hours. *E.g.*, Dkt. 125 at 57:10-22; GX 504, 504A, 533, 756. Spreadsheets calculated and tracked the actual price per doctor's order. *E.g.*, GX 617, 617A, 664, 664A, 757, 898. Contracts listed purported services at a clearly reverse-engineered prices, including a clearly fraudulent hour minimum of 142.*857* hours and a fee of $57.*142*. *E.g.*, Dkt. 106 at 112:4–133:24; GX 530D at 2; GX 530E at 2. Defendant

even called out those contracts as a sham in an email to Prizm. *E.g.*, GX 533 at 4. Defendant also paid telemedicine companies and knew that the telemedicine companies in turn employed and paid medical professionals to sign doctors' orders. *E.g.*, Dkt. 110 at 129:17–131:2; GX 16, 203, 695-96, 708, 788, 788A. The telemedicine practitioners prescribed DME, even though they could not see or examine the beneficiary. *E.g.*, Dkt. 115 at 56:9–57:3; Dkt. 125 at 42:18–43:10; GX 8, 100, 102, 104. Defendant directed marketers regarding what should be in the orders and which braces to prescribe. *E.g.*, Dkt. 103 at 23:12–24:8, Dkt. 106 at 95:11-25, Dkt. 110 at 34:6-22; GX 501, 523, 645, 704, 768.

Defendant was well aware of the right way to evaluate a patient for DME from his own chiropractic practice. *See United States v. Henderson*, 893 F.3d 1338, 1348–49 (11th Cir. 2018) (pointing to, among other things, the defendant's prior experience with the process as proof of criminal intent). Defendant was personally aware that patients, their families, and even a primary care doctor had complained that the patients did not want or need the DME. *E.g.*, Dkt. 105 at 18:1-11, 45:13-25; Dkt. 118 at 27:9-18, 112:13-23; GX 412, 412A, 414, 414A, 555, 557, 641, 644, 646, 648-51, 742, 824. These complaints repeatedly included that beneficiaries had dementia or Alzheimer's and therefore could not meaningfully direct their own care *E.g.*, Dkt. 118 at 114:1-8; GX 600-05, 607, 609, 820. The complaints flagged that beneficiaries had not been contacted by a medical professional, which Defendant discussed with Arthur Henderson. *E.g.*, Dkt. 115 at 46:15-23; GX 643, 708. One complaint even accused the conspirators of fraud. *E.g.*, DX 62. Defendant helped Henderson draft directions to

call centers how to overcome beneficiaries' concerns, including that they did not want or need braces. *E.g.*, Dkt. 115 at 37:10–38:5. He was aware how many pieces of DME Medicare was billed per beneficiary as he received this information in spreadsheets from Simms, on remittance advices, and in emails. *E.g.*, Dkt. 125 at 93:1-14; GX 855, 855A-E, 858, 858A-H, 877, 877A-D. Back Pain was repeatedly audited by Medicare and sent education letters about Medicare rules. *E.g.*, GX 10, 117-35. Defendant received remittance advices reflecting denied claims for deficient telehealth encounters and for lack of medically necessary. *E.g.*, Dkt. 123 at 80:15-22; GX 117.

Defendant signed an 855S Medicare enrollment form in 2016, before the conspiracy started, and on May 3 and 30, 2019, that put him on notice of relevant rules and regulations. GX 106, 108. It warned that he had an ongoing duty to disclose all owners and managing employees of Back Pain, that he could not let another entity use Back Pain to bill Medicare, that he could not submit false claims, and that he had to comply with all Medicare laws, regulations, and program rules, including the AKS. *E.g.*, Dkt. 125 at 76:2-13; GX 106 at 22-25; GX 108 at 43-47. Defendant certified that he read and understood these requirements. *E.g.*, Dkt. 125 at 82:5-21.

Throughout the conspiracy, Defendant received information about what the law required and from which a reasonable jury that could conclude that Defendant knew what he was doing was a crime. Contrary to Defendant's contention that he had no information (except incorrect information) about the AKS until March 2019, the evidence at trial reflected that in April 2018, he received a PowerPoint and attorney letter from Prizm about how the business was supposed to work and about

the laws at issue. *E.g.*, GX 900, 900A, 900B. Defendant also repeatedly signed contracts that referenced the AKS. *E.g.*, GX 507A-D, 530A-D, 629A, 763A, 769A-B. In February 2019, he reviewed an article called Telehealth and Orthotics Aggressive CMS Actions that explained that the conduct that he was engaging in was illegal. *E.g.*, Dkt. 125 at 112:8–117:6; GX 563; DX 72. Simms informed Defendant that every lawyer in the past 20 years had said Simms's program was illegal. *E.g.*, GX 563.

In March and April 2019, Defendant consulted a lawyer, Michael Silverman, who told him that he should stop paying telemedicine companies immediately and fully educated him about the relevant federal laws. *E.g.*, DX 92, 102. Silverman also warned Defendant to stop working with Simms, to report himself to Medicare, and to pay back what he had previously been paid by Medicare while working with Simms. *E.g.*, DX 102. Defendant did not follow that advice and continued to engage in the fraud, including continuing to pay Medtech to get doctors' orders signed. *E.g.*, GX 16, 697, 704, 803-805, 805A, 805B. At the same time, Defendant became aware of Operation Brace Yourself and that it resulted in thirty-six defendants being arrested for their involvement with DME and telemedicine. *E.g.*, Dkt. 124 at 32:11–33:6. In August 2019, he was sent the article he had previously sent in February 2019 and multiple other articles containing similar warnings, which was apparent just from the titles of the articles. *E.g.*, GX 574, 574A-I.

Defendant did not just receive this information passively. He emailed coconspirators informing them that what they were doing was a violation of the law. Each time he continued to work with and receive doctors' orders from those

coconspirators. *E.g.*, GX 533 at 1, 837, 898. Defendant emailed Prizm Media that his agreement with Prizm, according to his attorney, "would be consider a 'sham' Agreement by prosecutors and therefore not enforceable or legal" and "is a direct violation of AKS." *E.g.*, GX 533 at 4. In another email, he informed Harold "Hank" Bloom of ARB Marketing Inc. ("ARB") that it violated the AKS to pay for referrals and charging per "lead" would get them into "a lot of trouble" and directed Bloom to change the invoices to reflect sham hourly pricing. *E.g.*, GX 722 at 1.

The jury heard from Defendant at length and found him not to be credible. Defendant's motion relies on this rejected evidence. Dkt. 138 at 10. But a Rule 29 motion views all evidence in the light most favorable to the verdict. There was more than sufficient evidence for the jury to find that Defendant had the requisite intent.

**B. The Evidence was Sufficient to Establish a Single Conspiracy**

The evidence at trial established that Defendant was guilty of the single conspiracy charged in the Indictment. In determining whether a jury could reasonably have found that this evidence established a single conspiracy beyond a reasonable doubt, the Eleventh Circuit considers the following factors: (1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants. *United States v. Richardson*, 532 F.3d 1279, 1285 (11th Cir. 2008). "Courts typically define the common goal element as broadly as possible." *United States v. Moore*, 525 F.3d 1033, 1042 (11th Cir. 2008).

"[A] jury may find that a single conspiracy existed when 'a "key man" directs and coordinates the activities and individuals efforts of various combinations of

people.'" *Richardson*, 532 F.3d at 1285–86 (quoting *United States v. Edouard*, 485 F.3d 1324, 1347 (11th Cir. 2007)). "It is irrelevant that particular conspirators may not have known other conspirators or may not have participated in every stage of the conspiracy; all that the government must prove is an agreement or common purpose to violate the law and intentional joining in this goal by coconspirators." *Id.* at 1285 (citation omitted); *United States v. Barsoum*, 763 F.3d 1321, 1330 (11th Cir. 2014) ("[W]here the defendant was the key man or hub, a jury may properly conclude that a single conspiracy was proved at his trial, even where the spokes had no knowledge of each other." (citations omitted)). "If the defendant's actions facilitated the endeavors of other co-conspirators, or facilitated the venture as a whole, a single conspiracy is established." *Richardson*, 532 F.3d at 1285 (citation omitted). If members of a conspiracy share the same common goal, a coconspirator joining a conspiracy does not mean a new conspiracy has begun, just as a coconspirator exiting a conspiracy does not mean the conspiracy has ended. *Id.* at 1286. Similarly, "[s]eparate transactions are not necessarily separate conspiracies, so long as the conspirators act in *concert* to further a common goal. If a defendant's actions facilitated the endeavors of other co-conspirators or *facilitated the venture as a whole*, then a single conspiracy is established." *Richardson*, 532 F.3d at 1285 (citation omitted) (emphasis in original); *see also Evans Concrete LLC*, 2023 WL 3019058 at *4 (finding sufficient proof of a single conspiracy and noting that "'[a] conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis on its locale of operations.'" (quoting *United States v. Heinemann*, 801 F.2d 86, 92 (2nd Cir. 1986))).

"A conspiracy is presumed to continue until its objectives have been abandoned or accomplished." *Richardson*, 532 F.3d at 1286 (citation omitted).

Here, the evidence supported the jury's finding of guilt on a single conspiracy to commit health care and wire fraud. The Government proved at trial that Defendant joined and participated in a conspiracy with the common goal. Defendant and his coconspirators enriched themselves by defrauding Medicare, TRICARE, and CHAMPVA by submitting false and fraudulent claims for medically unnecessary braces that were obtained through the payment of kickbacks and based on false statements to Medicare. *See* Dkt. 125 at 130:19-23 (noting that the common goal was "for Back Pain, who is a DME, to be able to fill orders, which requires marketers to obtain beneficiaries, other parties to interface with telemed to get the doctors' orders and move them back up, as has been discussed ad nauseam in this case."). In furtherance of that conspiracy, Defendant also allowed other entities to use Back Pain to bill Medicare and concealed Greg Simms and DME Advanta's ownership and management of Back Pain. *E.g.*, DX 23; GX 877, 877A-877D, 881, 881A-881B.

The overlapping participants further demonstrate that a jury could reasonably have found a single conspiracy. *See* Dkt. 125 at 130:13-16 ("There's considerable overlap between the parties that were instrumental to making sure that beneficiaries were identified, telemed companies were coordinated with, and doctor orders were obtained."). Simms overlapped with Defendant, Lisa Webb, William "Billy" Novack and TrueAlliance Health Group LLC ("True Alliance"), Elite Healthcare Solutions LLC ("Elite"), The FPM Group dba Pioneer Telemedicine ("Pioneer"), the Hayats

and Prizm Media Inc. ("Prizm"), Arthur Geiss and Medtech Worldwide Inc. ("Medtech"), and Charles Kasbee. Webb overlapped with all of the conspirators presented at trial. Henderson, Schwartz, Roussonicolos, and Bloom all overlapped with Geiss and Medtech.

The fact that there may not have been a complete overlap of each of Defendant's conspirators at all times is irrelevant. *See Edouard*, 485 F.3d at 1347; Dkt. 125 at 130:24–131 ("That common goal never changed just because some of the parties that facilitated this common goal changed over time, sometimes due to law enforcement, sometimes due to fear, sometimes disagreement over the speed with which these were -- orders were filled."). Defendant, along with Simms (until his death) and Webb, was the hub or "key man" who helped direct and operate Back Pain across the conspiracy. He was connected to and understood the roles of the multiple overlapping participants.

Defendant argues that he could not have been the "key man" for the first part of the conspiracy because Simms played a greater leadership role in the conspiracy than he did. That Simms originally proposed the conspiracy, made more money, worked with customers other than Defendant, or helped recruit others to the conspiracy at the start does not make Defendant less of the hub of this conspiracy. While Simms might be the hub of a different conspiracy that included all of his customers, the conspiracy charged in this case centers around Defendant and the common goal of using his DME company to defraud Medicare, TRICARE, and CHAMPVA. Indeed, Defendant worked with the varying members of the conspiracy and directed many of them, especially as his role grew over time. Based on this

evidence—especially when viewed in the light most favorable to the government—the Government presented evidence sufficient to establish a common goal, underlying scheme, and overlap of participants for each of the conspiracies. The jury could have reasonably concluded that Defendant joined and participated in a single conspiracy.

### C. The Evidence was Sufficient to Prove False Statements

The Government admitted sufficient evidence to show false statements to Medicare. The Government presented evidence of four different ways that Defendant committed health care and wire fraud, only one of which involved proof of kickbacks. First, Defendant failed to disclose, despite an ongoing obligation to do so, Simms and DME Advanta's role as owners and managing employees of Back Pain.[2] In 2016, Defendant certified that he would disclose all owners and managing employees within thirty days of an individual or entity becoming an owner or manager. *E.g.*, GX 106 at 2, 16-19, 24-25. In September 2017, Defendant entered into the "DME Revenue Program" with Simms and DME Advanta, in which they generated referrals for and operated Back Pain in exchange for 95% of the profits. *E.g.*, GX 540, 540A. Defendant not only failed to disclose their role within thirty days of this change but did not disclose their role when he submitted a new application in March 2019, which he certified twice in May 2019. *E.g.*, GX 108 at 31-37, 47, 60, 63, 67. A Medicare program witness, Daniel Coney, testified that such failure to disclose ownership and management was material to Medicare. *E.g.*, Dkt. 99 at 47:6–48:1.

---

[2] Defendant also failed to disclose Webb's role as a managing employee.

Second, Defendant permitted third party entities (Rehab Health and RSE) to use Back Pain to bill claims. *E.g.*, Dkt. 118 at 73:12-2; DX 23. Both Medicare enrollment applications made clear that this was a violation of Medicare laws, rules, and regulations, with which Defendant promised to comply. *E.g.*, GX 106 at 2, 25; GX 108 at 3, 60, 63, 67. Coney testified that this was also material to Medicare.

Third, Defendant billed for medically unnecessary DME. *E.g.*, DX 23; GX 877, 877A-D, 881, 881A-B. He was especially well positioned to understand that the braces were medically unnecessary as a chiropractor who had prescribed braces, including to Medicare beneficiaries. Most beneficiaries received multiple braces, as many as eight at one time. *E.g.*, GX 8, 102. The beneficiaries were prescribed the DME by practitioners who had no prior relationship with, never examined, never saw, sometimes never spoke to, and never ran diagnostic tests on them. Defendant and his conspirators were making decisions about what diagnostic codes should be used, what braces could be prescribed, and what should be contained in the orders. *E.g.*, Dkt. 112 at 124:9–125:21; GX 523, 645, 768. As the Government's medical expert explained, braces cannot be prescribed via the phone or off information gathered by a telemarketer. *E.g.*, Dkt. 99 at 36:4-19. The orders for braces, CGM, and other DME, which Defendant personally received, were templates that did not establish medical necessity or meet Medicare's requirements. *E.g.*, Dkt. 118 at 105:4-12, GX 316. Defendant received numerous complaints that the braces were medically unnecessary. A dozen beneficiaries were already deceased. *E.g.*, Dkt. 99 at 33:18–34:3. Some who received CGM were not even diabetic. *E.g.*, GX 736. Defendant was

aware from Medicare audits and denials that the braces were medically unnecessary and products of a problematic telehealth encounters. *E.g.*, GX 880, 880A.

Fourth, consistent with *United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007), Defendant falsely certified he would not pay kickbacks. *Medina* held that "paying kickbacks alone" is not "sufficient to establish health care fraud without someone making a knowing false or fraudulent representation to Medicare." *Id.* at 1298. In *Medina*, only one of the defendants had signed Medicare applications, and the Court upheld her health care fraud convictions that post-dated these applications because, in the application, she promised not to pay kickbacks, which constituted a "knowing misrepresentation." *Id.* at 1298-1300. Here, Defendant personally signed a Medicare application on May 3, 2019, promising not to violate the AKS after he had already paid kickbacks to Prizm, Elite, True Alliance, and Pioneer and was actively paying kickbacks to Medtech and Summit Marketing Solutions Inc. ("Summit"). *E.g.*, GX 16. Defendant then continued to pay kickbacks, paying kickbacks to Medtech, Prizm, Summit, Geiss, and ARB Marketing Inc. (Bloom). *E.g.*, GX 16. Emails and witness testimony established that he was buying patient referrals in the form of qualified leads, doctors' orders, and doctors' signatures on orders from these sources. *E.g.*, Dkt. 102 at 5:18–6:2; Dkt. 106 at 13:25–14:1, 104:8-21, 124:3-17; Dkt. 110 at 95:18–96:1; Dkt. 112 at 119:13-20, 122:20-25. Defendant admitted that he was buying doctors' orders from several of them. *E.g.*, Dkt. 125 at 23:25–24:5, 25:3-6, 41:16–42:2. Witnesses testified that Medtech was a purported telemedicine company being paid per consult to obtain medical professionals' signatures on orders from the medical

professionals in their employ and that Medtech paid the medical professionals. This was corroborated by emails with spreadsheets listing which states Medtech was employing doctors at that time, discussing how many doctors' orders had been generated, and listing the price per doctor's consult.[3] There was more than sufficient evidence for a reasonable jury to convict Defendant.[4]

### D. The Evidence was Sufficient to Establish Venue in the Middle District of Florida

"In a conspiracy case, venue is proper in any district where an overt act was committed in furtherance of the conspiracy." *United States v. Smith,* 918 F.2d 1551, 1557 (11th Cir. 1990) (citations omitted). "An overt act 'may be that of only a single one of the conspirators and need not be itself a crime.'" The overt act may be committed by any single conspirator or anyone who aids or abets a conspirator and need not be a criminal act. *United States v. Schlei*, 122 F.3d 944, 975 (11th Cir. 1997); *United States v. Shoss*, 523 F. App'x 713, 715 (11th Cir. 2013) (citing *United States v. Bradley,* 644 F.3d 1213, 1255 n. 87 (11th Cir. 2011)). "The overt act need not be committed by a defendant in the case; the acts of accomplices and unindicted co-conspirators can also expose the defendant to jurisdiction." *United States v. Matthews*, 168 F.3d 1234, 1246 (11th Cir.); *cf. United States v. Spitsyn*, No. 1:20-CR-325-MLB,

[3] Defendant appears to argue that there was insufficient evidence that he agreed to pay kickbacks outside of the AKS. Dkt. 138 at 17-18. The Government did not assert otherwise at trial.

[4] In his motion, Defendant does not appear to challenge the sufficiency of the Government's proof that wires were used as part of the conspiracy. The payments to coconspirators were made via interstate wire. Emails, faxes, and voicemails were entered into evidence at trial and all wires used in furtherance of the conspiracy.

2022 WL 500772, at *3 (N.D. Ga. Feb. 18, 2022) (finding venue was sufficiently alleged where the defendant was not a member of the conspiracy when the relevant overt act occurred). The overt act that establishes venue need not be alleged in the indictment. *Shoss*, 523 F. App'x at 715–16 (citing *Schlei*, 122 F.3d at 975 n.10).

The government need only prove venue by a preponderance of the evidence. "In order to sufficiently prove venue, the government need only show, by a preponderance of the evidence, that an overt act was committed in the district of prosecution." *Shoss*, 523 F. App'x at 715 (citing *United States v. Barnes,* 681 F.2d 717, 722 (11th Cir. 1982)). "'In determining whether the prosecution met this burden, the evidence and all reasonable inferences derived therefrom must be viewed in the light most favorable to the government.'" *Id.* (citation omitted). "The government's burden is satisfied when 'circumstantial evidence as a whole reasonably supports the inference that the crime was committed in the trial district.'" *United States v. Alexander*, 170 F.4th 1303, 1310 (11th Cir. 2026) (citation omitted).

Here, there were multiple overt acts in furtherance of the conspiracy committed in the Middle District of Florida. Defendant agreed to purchase doctors' orders from William Novack and sent wires to True Alliance for those orders. *E.g.*, GX 201. Novack and his office manager Samantha Mahnke (formerly Carlucci) testified that they were located in, and Novack's business True Alliance operated out of, Orlando. "[A]s a member of the conspiracy, [the defendant] was exposed to jurisdiction where other conspirators were exposed to jurisdiction." *United States v. Peralta*, 815 F. App'x 364, 370 (11th Cir. 2020) (citing *Matthews*, 168 F.3d at 1246). Novack and those who

aided and abetted him engaged in numerous overt acts in this District. Emails between Simms, Defendant, Novack, and others who aided or abetted them were sent from and received and acted upon in this District. The sham contract, which Novack signed, and sham invoices were generated in and sent from this District to Defendant. The orders sold to Defendant were uploaded into DropBox by True Alliance's operation in the District. Sending each order was an overt act in furtherance of the conspiracy.

Defendant claims that Novack should be excluded for the purposes of venue. But the evidence, including Novack and Mahnke's testimony, emails, spreadsheets, contracts, and invoices, established that he conspired with Novack. Defendant received the True Alliance welcome letter setting out the price per doctor's order. *E.g.*, GX 626A. Novack sold Defendant medically unnecessary doctors' orders. *E.g.*, Dkt. 115 at 32:16–33:3, 40:14-20. Defendant signed a sham contract drafted by Novack and paid True Alliance's sham invoices. *E.g.*, GX 201, 629A. He received spreadsheets tracking the orders with the price per order; received replacement orders if Medicare would not reimburse for an order he purchased; and emailed with Novack and others about the fraud. Defendant was aware that patients and their families repeatedly complained they did not want or need the braces tied to orders purchased from Novack. These orders were billed by Back Pain while Simms and DME Advanta's role was hidden from Medicare. *E.g.*, GX 15, 16, 108, 664A. Defendant paid True Alliance by wire and communicated with True Alliance by wire (emails).

Further, that Novack did business with Defendant before the March 2019 855S, which was signed in May 2019, does not make the numerous overt acts by Novack

any less relevant to venue. *E.g.*, GX 106, 108. Those payments are part of the proof required by *Medina* as they establish that Defendant was paying kickbacks before his Medicare certification, as well as proof of medically unnecessary claims and claims submitted while Simms and DME Advanta's roles were hidden from Medicare.

Defendant also purchased doctors' orders from Charles Kasbee,[5] who used telemedicine companies to generate orders he sent to Defendant. *E.g.*, Dkt. 110 at 95:18–96:1. Two of the telemedicine companies, RCE dba MSMD and Blue Mosaic, were located in this District. *E.g.*, Dkt. 110 at 121:25–122:19. That Defendant did not interact directly with RCE and Blue Mosaic irrelevant. His coconspirator Kasbee sent money to and obtained orders for Defendant from those entities in the District, and those telemedicine companies themselves were part of the conspiracy. Indeed, Defendant conceded that if the case involved a single conspiracy which included those telemedicine companies, then venue was proper in this District. *E.g.*, Dkt. 120 at 20:13–21:6. Further, conspirator call centers called or were called by Medicare beneficiaries who lived in this District, and DME was shipped those beneficiaries in this District. One of the drop shippers, DDP, shipped braces ordered by Defendant from this District. Claims data and other spreadsheets reflected that some of the medical professionals working for the telemedicine companies and prescribed the

[5] Defendant claims that the Government agreed that none of the orders that Kasbee sent were billed to Medicare. Dkt. 138 at 21. That is not what the Government stipulated. Instead, the Government agreed that the doctors' orders sent by Kasbee to Defendant as part of one email exchange, GX 757, were not billed to Medicare. Nor did Kasbee testify that he only used the Middle District of Florida-based telemedicine companies for genetic testing. He testified to generating orders for Defendant using those companies. *E.g.*, Dkt. 110 at 95:18–96:1.

braces were located in this District. *E.g.*, Dkt. 116 at 51:15–52:5.

Defendant's argument that the location of the Medicare beneficiaries cannot establish venue misunderstands the evidence. "[A]ny offense begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. 3237(a). Venue is proper in both the district where a phone call originated and was received. *Shoss*, 523 F. App'x at 716 (citing *United States v. Strickland,* 493 F.2d 182, 187 (5th Cir. 1974)); *United States v. Vega*, No. CRIM. 10-0226-WS, 2011 WL 3209127, at *2 (S.D. Ala. July 27, 2011) ("The overt act of a telephone call is performed both where the call is made and where it is received." (citations omitted)). Defendant and his conspirators directed their scheme at the Middle District of Florida by running advertisements directed at beneficiaries in the district, making calls to and receiving calls from beneficiaries in the District in order to obtain the information necessary to bill Medicare, and sending braces and other DME to the District. *See United States v. Ubak-Offiong*, 64 F. App'x 859, 861, 863 (5th Cir. 2010) (affirming the denial of a venue jury instruction because although the defendant's entity was located in another district, she received patient information about beneficiaries who resided in the charging district, directed her scheme to them, and delivered power scooters to them). Defendant and his conspirators directed their scheme toward this District and could not have completed their scheme without gathering beneficiary information and shipping the braces. "[W]here a criminal conspirator commits an act in one district which is intended to further a conspiracy by virtue of its effect in another district, the

act has been committed in both districts and venue is properly laid in either." *United States v. Lewis*, 676 F.2d 508, 511 (11th Cir. 1982) (citation omitted).

That this year's long, national conspiracy could have been charged elsewhere is of no moment. *See Spitsyn*, 2022 WL 500772, at *3 ("Conspiracies that last years, involve international connections, and conspirators in multiple states may very well occur in multiple districts."). "[T]he fact that a majority of a conspiracy's activity took place in a venue other than the one where the trial takes place does not destroy venue." *Matthews*, 168 F.3d at 1246 (citation omitted); *see also United States v. Vaughn*, No. 2:14-CR-135-FTM-38CM, 2015 WL 7721250, at *5 (M.D. Fla. Nov. 30, 2015). The evidence of venue was more than sufficient for a reasonable jury to convict.

### E. The Evidence Established that the Conspiracy Continued within the Statute of Limitations

Defendant asserts that there was insufficient evidence that the conspiracy post-dated November 11, 2019. Dkt. 138 at 22-23. This is without merit. Defendant continued to pay for receive doctors' signatures on orders from Medtech into December 2019. *E.g.*, GX 16, 203. He continued to purchase doctors' orders for braces from Henderson until early 2020, who was in turn paying Medtech for the doctors' signatures on those orders. *E.g.*, Dkt. 115 at 83:16–84:4. In 2020, Henderson and Defendant shifted from braces to CGM, continuing the same conspiracy with the same common goal but with a different product. Henderson sold Defendant patient referrals in the form of qualified leads into October 2020. *E.g.*, Dkt. 115 at 86:15-24; GX 205, 808, 812, 812A, 814. Defendant purchased doctors' orders from Prizm in 2019,

continuing to receive and bill those orders to Medicare into December 2019, and reached out to Prizm to resume business in September 2020. *E.g.*, Dkt. 128 at 16:9–18:5; GX 102, 897, 898. Both well before and after November 11, 2019, Defendant continued to work with Webb to operate Back Pain. *E.g.*, GX 891. Further, the claims data reflects that Defendant continued to bill Medicare, TRICARE, and CHAMPVA for DME past November 11, 2019. Beneficiaries continued to receive multiple braces past that date. *E.g.*, GX 100, 102, 104. Correspondence reflects that patients were receiving CGM after that date who were not diabetic. *E.g.*, GX 736.

Defendant's arguments are unavailing. First, that Defendant stopped billing one type of back brace when it was being actively audited by Medicare does not suggest that the conspiracy ended. Instead, his decision to stop billing one of the most lucrative braces when Medicare started to scrutinize its billing is evidence of criminal intent. If patients really needed the brace and it was being properly prescribed and billed, there would be no reason to stop. Second, that Simms had died and Defendant was no longer getting orders from True Alliance does not mean that conspiracy ended. Defendant continued to work with overlapping conspirators, including Webb, Henderson, Geiss/Medtech, and Prizm, both before and after November 11, 2019. The conspiracy continued almost a year past that date, as alleged in the Indictment and the jury reasonably found. The motion should be denied.

## IV. CONCLUSION

For the reasons above, Defendant's Rule 29 motion should be denied.

Respectfully Submitted,

GREGORY W. KEHOE
United States Attorney

LORINDA LARYEA
Chief, Fraud Section
United States Department of Justice
Fraud Section, Criminal Division

By: */s/ Catherine Wagner*
Catherine Wagner
Acting Assistant Chief
Florida Special Bar No. A5502410
Raymond E. Beckering III
Trial Attorney
Florida Special Bar No. A5503174
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Ave NW
Washington, DC 2005
Phone: (202) 794-0097
Email: catherine.wagner@usdoj.gov
Phone: (202) 262-8176
raymond.beckering.iii@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to defense counsel.

*/s/ Catherine Wagner*
Catherine Wagner
Acting Assistant Chief